# Exhibit A

# OPTION AGREEMENT

This agreement (the "Option Agreement") is made as of October 28, 1999, among the following parties (the "Parties"):

Novi List, d.d., a joint stock company formed under the laws of Croatia, having its address at Zvonimirova 20a, Rijeka, Croatia, as represented by Zdenko Mance, Director, acting under the Charter (the "Company" or "Novi List"); and

Media Development Equity Fund, LLC, a limited liability company registered under the laws of the State of New York, USA, having its address at 45 West 21st Street, New York, NY 10010, USA, as represented by Kenneth Anderson, Chairman, based on Certificate of Incorporation (the "Equity Fund").

## PREAMBLE

WHEREAS, Novi List is purchasing a new printing press and upgrading its printing facility;

WHEREAS, to fund the purchase of the printing press, Novi List has entered into a Foreign Exchange Loan Facility and Guarantee Agreement dated August 19, 1999, with Raiffeisenbank Austria d.d, Soros Economic Development Fund ("SEDF"), Karlovački List d.o.o. and Adamić d.o.o. (the "RBA Agreement");

WHEREAS, for the benefit of Novi List, Media Development Loan Fund (the "MDLF"), the owner of the Equity Fund, has guaranteed to SEDF that MDLF will reimburse to SEDF any funds it must pay pursuant to the guarantee provisions of the RBA Agreement;

WHEREAS, in order to consolidate the ownership of Novi List, the management of Novi List has established a new company ("Riječki list") to collect shares in Novi List;

WHEREAS, in order to facilitate said consolidation of ownership, Riječki list is borrowing funds from MDLF for the purchase of Novi List shares;

WHEREAS, in order to fund the upgrading of Novi List's printing facility and to further facilitate the consolidation of ownership in Novi List, Novi List is issuing new shares for purchase by the Equity Fund; and

WHEREAS, to effectuate the above, Novi List, Riječki list, MDLF and the Equity Fund have entered into a Memorandum of Understanding and, in accordance therewith, are entering into a series of inter-locking agreements;

The Parties agree as follows:

1

ARTICLE 1
DEFINITIONS

1.1.   Definitions.

"Agreements" means the MoU, the Share Subscription Agreement, the Credit Agreement and the Shareholders Agreement;

"Calculated Option Share Value" means the Original Purchase Price multiplied by the Multiplier;

"Credit Agreements" means the Credit Agreement between MDLF and Riječki list, dated October 28, 1999;

"Exercise Period" means the period (1) commencing on the later of (a) one year following the date on which the Interested Third Party as hereinafter defined completes full payment to MDLF of all sums due under the Credit Agreement or (b) the date on which the Company completes full payment of all sums due under the RBA Agreement, and (2) expiring on December 31, 2010;

"Exercise Price" means the Calculated Option Share Value, except that it shall mean (a) the Minimum Option Share Value if the Minimum Option Share Value is higher than the Calculated Option Share Value, or (b) the Maximum Option Share Value if the Maximum Option Share Value is lower than the Calculated Option Share Value;

"Interested Third Party" means Riječki list;

"LIBOR" means, for each one-year period commencing on September 15, the London interbank fixing rate for dollars as identified in the *Financial Times* column titled "World Interest Rates" on September 15 of each such one-year period ;

"Maximum Option Share Value" means the Original Purchase Price increased by 10% annually, compounded on an annual basis over the Valuation Period;

"Minimum Option Share Value" means the Original Purchase Price increased by LIBOR plus 2% annually over the Valuation Period;

"Market Value" means the fair market value per Option Share to be determined by the Parties using the Net Present Value method of valuation in a format to be reasonably agreed upon by the Parties, or, if they cannot agree within the time provided herein, then by arbitration in accordance with Article 8.2 hereof;

"MDLF" means Media Development Loan Fund;

2

"MoU" means the Memorandum of Understanding among the Company, the Equity Fund, MDLF and Riječki list, dated October 28, 1999, a copy of which is attached hereto as Exhibit A;

"Multiplier" means the percentage change in the Market Value of an Option Share between the beginning and the end of the Valuation Period;

"Non-Option Shares" means any Shares now or in the future held by the Equity Fund other than the Option Shares;

"Option" means the right, but not the obligation, to repurchase the Option Shares as set forth in Article 2 hereof;

"Option Shares" means 12,127 of the Shares purchased by the Equity Fund pursuant to the Share Subscription Agreement to which the Option to repurchase set forth in Article 2 hereof shall apply;

"Original Purchase Price" means the price paid per share by the Equity Fund under the Share Subscription Agreement;

"Repurchase Notice" has the meaning specified in Article 2.3 hereof;

"Share(s)" means one or more shares of common stock issued by Novi List;

"Shareholders Agreement" means the Shareholders Agreement between the Equity Fund and Riječki list, dated October 28, 1999;

"Share Subscription Agreement" means the Share Subscription Agreement between the Company and the Equity Fund, dated October 28, 1999; and

"Valuation Period" means the period from the date on which the Equity Fund makes payment for the Shares under the Share Subscription Agreement to the date on which the Parties execute the writing pursuant to Article 2.4.

1.2.    Conflict of Terms.  In case of conflicting interpretation of the terms contained herein and in any of the Agreements, the definitions set forth in Article 1.1 shall be controlling with respect to this Option Agreement.

## ARTICLE 2
## OPTION

2.1    Option to Repurchase Shares.  Provided that the Company has duly fulfilled all of its obligations under the terms and conditions of the Agreements, and subject to the terms and conditions of this Option Agreement, and specifically upon the satisfaction of the conditions

precedent set forth in Article 3 hereof, the Company shall have the option to purchase the Option Shares from the Equity Fund at any time during the Exercise Period at the Exercise Price (the "Option"). The Company may purchase the Option Shares in whole or in part, in one or more tranches.

2.2.    Exercise Period. The Exercise Period shall begin on the later of (a) one year from the date on which the Interested Third Party completes full payment to MDLF of all sums due under the Credit Agreements or (b) the date on which the Company completes full payment of all sums due under the RBA Agreement, and shall end on December 31, 2010, after which date the Option shall immediately expire.

2.3.    Exercise of Option. For each tranche of Option Shares that the Company wishes to repurchase under Article 2.1, the Company must deliver to the Equity Fund written notice of its intent to exercise the Option (the "Repurchase Notice"). The Repurchase Notice shall identify the number of the Option Shares that the Company wishes to repurchase, shall bear the date on which the Repurchase Notice is being sent to the Equity Fund, and shall certify that the conditions precedent of Article 3 below have been fully satisfied as of that date. Any Repurchase Notice received by the Equity Fund after December 31, 2010, shall be null and void.

2.4.    Determination of the Exercise Price. The Parties shall determine the Exercise Price for a given tranche of Option Shares, using the methodology set out in Appendix 1 hereto, within 45 days after the receipt of the Repurchase Notice by the Equity Fund, and within that time both Parties shall execute a writing setting forth the Exercise Price.

2.5.    Payment of the Exercise Price. Within ten banking days after the Parties execute a writing setting forth the Exercise Price for a given tranche of Option Shares, the Company shall transfer the amount due for the Option Shares, equal to the number of Option Shares being repurchased multiplied by the Exercise Price, to an account designated by the Equity Fund, exclusive of any taxes, levies, etc. The Company shall pay all stamp duties, withholding or other similar taxes, as well as all other types of charges, which may be levied or assessed on the purchase and/or the remittance of payments to the Equity Fund.

2.6.    Transfer of Shares. Upon the Equity Fund's receipt of payment for the Option Shares repurchased by the Company, the Equity Fund shall transfer those Option Shares to the Company free from all security interests, options, claims or other third party rights or encumbrances of any nature whatsoever, together with all rights attached to them. The Company shall deliver to the Equity Fund an excerpt from the register showing that title to the repurchased Option Shares have been transferred from the Equity Fund to the Company.

2.7.    Market Value of Option Shares at Commencement of Valuation Period. For the purpose of determination of the Multiplier, the Parties shall agree on the Market Value of the Option Shares at the commencement of the Valuation Period within 3 months of the payment for the Shares pursuant to the Share Subscription Agreement.

2.8.    Annual Notice of LIBOR. Until the Option can no longer be exercised, the Equity Fund will provide to the Company, no later than October 31 of each year, written notice of the

4

value of LIBOR for that year for purposes of calculating the minimum Option Share Value.

2.8.    <u>No Cash Premium</u>.    The Parties acknowledge that no cash premium has been received by the Company, the Interested Third Party, the Equity Fund or MDLF in consideration for the Option.

ARTICLE 3
CONDITIONS PRECEDENT

3.    <u>Conditions Precedent</u>. The right of the Company to repurchase the Option Shares from the Equity Fund shall be subject to the fulfillment of the following conditions precedent on or prior to the date of any Repurchase Notice, it being understood that such conditions may be waived in writing in whole or in part by the Equity Fund at any time:

3.1.    The representations and warranties specified in Article 4 hereof shall each be true and correct in all material respects as of the date of this Option Agreement and the date of any Repurchase Notice.

3.2.    The Company shall have obtained and/or maintained in force or renewed all governmental, corporate, shareholders' and other necessary licenses, approvals, consents, registrations or filings relating to: (i) the purchase of the Option Shares, (ii) the carrying on of the business of the Company as it is presently carried on, (iii) the due execution and delivery of, and performance under, this Option Agreement, and (iv) the ability of the Company to remit to the Equity Fund, in convertible currency, all monies that are or may be payable in respect of the purchase of the Shares;

3.3.    All the Agreements shall have been duly executed and none of the Agreements has terminated for any reason other than performance in full of any and all obligations by the parties thereto.

3.4.    All the conditions precedent set forth in the Agreements shall have occurred.

3.5.    The Company and the Interested Third Party shall each have performed in full any and all of its respective obligations under the Agreements;

3.6.    The Company shall have fully repaid all sums due under the RBA Agreement; and

3.7.    The Interested Third Party shall have repaid in full all sums due MDLF under the Credit Agreements at least one year prior to the date of the first Repurchase Notice.

5

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

4.1.    <u>Representations and Warranties of Equity Fund</u>.  The Equity Fund represents and warrants as follows:

4.1.1.  There are no options or other agreements outstanding which call for the transfer of the Option Shares to any person or accord any person the right to call for or require the transfer of the Option Shares. There are no options or other agreements outstanding which accord any person the right to call for or require the issue or the creation of any pledge, lien or other security or encumbrance over any of the Option Shares.

4.1.2. There is no power of attorney or proxy issued by the Equity Fund to any person, other than a *bona fide* representative of the Equity Fund, authorizing that person to vote the Option Shares.

4.1.3. This Agreement has been duly and validly executed and delivered by the Equity Fund. This Agreement constitutes the valid and binding obligation of the Equity Fund, enforceable in accordance with its terms.

4.2.    <u>Representations and Warranties of the Company</u>.  The Company represents and warrants as follows:

4.2.1. The financial statements of the Company heretofore delivered constitute its financial statements and present fairly its financial position, assets and liabilities as of the date set forth therein.  Since the date of the most recent financial statements, there has been no material adverse change in the financial or other conditions of the Company.

4.2.2.  There is no fact which the Company has not disclosed in writing to the Equity Fund which materially adversely affects or, as far as the Company can now foresee, will materially adversely affect the properties, affairs, prospects, or condition (financial or otherwise) of the Company.

4.2.3.  There is no action, suit or proceeding pending against, or to the knowledge of the Company threatened against or affecting, the Company before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely affect the business, financial position or results of operations of the Company or which in any manner draws into question the validity of this Agreement.

4.2.4.  All tax returns and other reports required by applicable law to be filed by the Company have been filed, and all taxes, assessments and other governmental charges imposed upon the Company or any property of the Company and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment

6

thereof.

4.2.5. The Company is a joint stock company duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and has all corporate or other organization powers and all material governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted. The Company has good and marketable title to all of its properties and assets, free and clear of all liens, security interests and other charges and encumbrances.

4.2.6. This Agreement has been duly and validly executed and delivered by the Company. This Agreement constitutes the valid and binding obligation of the Company, enforceable in accordance with its terms.

## ARTICLE 5
## COVENANTS OF THE COMPANY

5.1.   <u>Affirmative Covenants</u>.  For as long as the Equity Fund is a shareholder of the Company, the Company shall, unless the Equity Fund shall otherwise agree:

5.1.1.  conduct its business (i) with due diligence and efficiency, (ii) in compliance with all applicable laws, regulations and orders of any governmental authority, (iii) in conformity with the general practice of independent, non-partisan, pluralistic, tolerant and responsible media; and (iv) in accordance with sound financial and accounting practices;

5.1.2.  obtain and maintain in force or, where appropriate, renew all governmental, corporate, shareholders' and other necessary licenses, approvals, consents, registrations and filings required for the purposes described in Article 2 hereof, and fully perform and observe all the conditions and restrictions contained in, or imposed on the Company by, such licenses, approvals or consents;

5.1.3.  make changes and improvements to its accounting department, accounting practices and accounting system to the Equity Fund's satisfaction; and

5.1.4.  give access to the Equity Fund's representative or agent to the Company's books and other financial records at all reasonable times.

5.2.   <u>Negative Covenants</u>.  For as long as this Option Agreement is in effect as defined in Article 8.8 hereof, the Company shall not do any of the following without the prior written approval of the Equity Fund and the Interested Third Party:

5.2.1.  take any action which in any manner would be inconsistent with this Option Agreement, including but not limited to the making of changes, or permitting changes to be made, to the Company's Charter; provided that with respect to any proposed changes to the Charter, the decision by the Equity Fund as to whether or not to consent to such change shall not be unreasonably withheld;

7

5.2.2. make changes, or permit changes to be made, to the nature of its present business, or merge or consolidate with any person or entity, or sell, assign, lease or otherwise transfer or dispose of, whether in one transaction or in a series of related transactions, all or a substantial portion of its assets;

5.2.3. initiate any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, winding-up, liquidation or similar proceeding relating to the Company under the laws of any jurisdiction;

5.2.4. change its capital, including any increase or decrease in its share capital, redenomination, or splits of shares, or any action which might result in the dilution of the value of its shares;

5.2.5 issue any additional shares;

5.2.6. enter into a transaction or a series of transactions the value of which is in excess of 500,000 DEM, other than the transactions described in the Business Plan of the Company, submitted to and approved by the Equity Fund on the date first above written;

5.2.7. create or suffer to exist any debts, mortgage, pledge, liens, security interest or other charge or encumbrance, the value of which is DEM 500,000 or more, whether in one transaction or in a series of transactions;

5.2.8. enter into any management contract or similar arrangement whereby its business or operations are managed by any other person; or

5.2.9. exercise, or grant to any shareholder or third party the right to exercise, any pre-emptive right that would prevent, interefere with or in any way impair the sale, pledge or other transfer or hypothecation of the Option Shares or the Non-Option Shares by the Equity Fund acting in accordance with Article 6 hereof.

## ARTICLE 6
## COVENANTS OF THE EQUITY FUND

6.1. <u>Non-Option Shares</u>. The Equity Fund shall not sell, pledge or otherwise transfer or hypothecate the Non-Option Shares to any party other than the Company or the Interested Third Party until after the earlier of (a) the Equity Fund's first receipt of a Repurchase Notice from the Company, (b) June 30, 2009, or (c) termination of this Option Agreement pursuant to Article 7 hereof. Thereafter, subject to Article 6.4 below, the Equity Fund shall have the right to sell, pledge or otherwise transfer or hypothecate the Non-Option Shares at any price to any party.

6.2. <u>Option Shares</u>. The Equity Fund shall not sell any of the Option Shares other than to the Company, and shall hold the Option Shares clean of any pledge, lien or other security or encumbrance, until the earlier of (a) December 31, 2010 or (b) termination of this Option Agreement pursuant to Article 7 hereof. Thereafter, subject to Article 6.4 below, the Equity Fund shall have the right to sell, pledge or otherwise transfer or hypothecate the Option Shares at

8

any price to any party.

6.3.    <u>Exclusion from Pre-emptive Rights</u>.  Any sale, pledge or other transfer or hypothecation of Non-Option Shares or Option Shares by the Equity Fund in accordance with this Article shall not be subject to the exercise of any pre-emptive rights by the Company, other shareholders in the Company or any other parties, as set forth in Article 5.2.9.

6.4.    <u>Right of Approval</u>.    Any sale, pledge or other transfer or hypothecation of Non-Option Shares or Option Shares by the Equity Fund in accordance with this Article shall be subject to the Interested Third Party's approval of the transferee, which shall not be unreasonably withheld. Such right of approval shall not survive termination or expiration of this Option Agreement.

ARTICLE 7
TERMINATION

7.1.    <u>Termination</u>.  This Option Agreement and the Option shall automatically terminate upon the occurrence of any one of the following:

    7.1.1.  Termination of any of the Agreements for any reason other than its performance in full; or

    7.1.2.  Breach of any of the provisions of this Option Agreement by the Company; or

    7.1.3.  Breach of any of the provisions of any of the Agreements by the Company or by the Interested Third Party; or

    7.1.4.  Any default by the Company under the RBA Agreement.

7.2.    <u>Breach of Credit Agreement</u>.  Without prejudice to any other right hereunder, the Company acknowledges that the breach of any of the provisions of the Credit Agreements by the Interested Third Party automatically terminates this Option Agreement and the Option.  For the purposes of this Article 7.2, a copy of the notice of default by MDLF to the Interested Third Party shall constitute sufficient evidence of any such breach.

7.3.    <u>Rights of Equity Fund upon Termination</u>.  In case of termination, the Equity Fund shall have the right to dispose of all of its shares in any way that it sees fit without restrictions of any nature whatsoever, and in particular without regard to any pre-emptive rights and without obtaining approval of the Interested Third Party under Article 6.4 hereof.

ARTICLE 8
MISCELLANEOUS

8.1.    <u>Governing Law</u>.  This Option Agreement shall be governed by, and construed in



9

accordance with, the laws of the State of New York.

8.2.  **Consent to Jurisdiction; Arbitration; Waiver of Jury Trial; Etc.**

8.2.1.  The Company hereby (i) irrevocably submits to the non-exclusive jurisdiction of any New York State Court in the County of New York or United States District Court for the Southern District of New York (the "Federal Court") in any action or proceeding arising out of or relating to this Option Agreement, (ii) waives any objection or defense based on doctrines of venue or forum nonconvenience or similar rules or doctrines, and (iii) irrevocably agrees that all claims in respect of such an action or proceeding may be heard and determined in such New York State Court or Federal Court.

8.2.2.  The Company and the Equity Fund waive any right to trial by jury in any action, proceeding, or counterclaim arising out of or relating to this Option Agreement.

8.2.3.  The Company hereby irrevocably and unconditionally appoints National Corporate Research, Ltd. (the "New York Process Agent") with an office on the date hereof at 225 West 34th Street, New York, New York 10122, as its agent to receive on behalf of the Company and its property service of copies of the summons and complaint and any other process which may be served in any such action or proceeding in any such New York State Court or Federal Court and agrees promptly to appoint a successor New York Process Agent in the County of New York, State of New York which successor Process Agent shall accept such appointment in writing prior to the termination for any reason of the appointment of initial New York Process Agent and that such Process Agents will accept the appointment in writing and consent to the terms hereof and the Company will deliver evidence of the foregoing to the Equity Fund together with the name and address of any successor Process Agent.  In any such action or proceeding in such New York State Court or Federal Court, such service may be made on the Company by delivering a copy of such process to the Company in care of the appropriate Process Agent at such Process Agent's address (such service to be effective upon such receipt by the appropriate Process Agent).  The Company hereby irrevocably and unconditionally authorizes and directs such Process Agent to accept such service on its behalf.  As an alternate method of service, the Company irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding in such New York State or Federal Court by mailing of copies of such process to the Company, by certified or registered air mail at its address referred to in Article 8.7.  The Company agrees that, to the fullest extent permitted by applicable law, a Final Judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the Judgment or in any other manner provided by law.  Nothing herein shall affect the right of the Equity Fund to service of process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against the Company in any other jurisdiction.

8.2.4.  The Equity Fund may, in its sole discretion, as an alternative to litigation elect to arbitrate any claim or dispute arising out of or relating to this contract or the validity thereof against the Company in accordance with the commercial arbitration rules of the American Arbitration Association by a sole arbitrator.  In the event that the lender elects arbitration, the Company hereby consents to submit the dispute to such arbitration.  The Company may not elect arbitration without the consent of the Equity Fund and is bound by the Equity Fund's election as

10

between litigation and arbitration. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. Section 1-16, and judgment upon the award rendered jurisdiction by the arbitrator may be entered by any court having jurisdiction thereof as limited herein. The place of arbitration shall be in the County of New York, State of New York. The arbitrator is empowered to award damages in excess of compensatory damages. The Company agrees that, to the fullest extent permitted by applicable law, a final award in any such arbitration shall be conclusive and may be enforced in other jurisdictions by suit on the award or in any other manner provided by law.

8.2.5. Nothing in this provision shall be deemed to (i) limit the applicability of any otherwise applicable statutes of limitation or repose and any waivers contained in this provision; or (ii) limit the right of the Equity Fund hereto (a) to exercise self help remedies such as (but not limited to) setoff, or (b) to foreclosure against any real or personal property collateral, or (c) to obtain from a court provisional or ancillary remedies such as (but not limited to) injunctive relief, writ or possession or the appointment of a receiver. The Equity Fund may exercise such self help rights, foreclose upon such property, or obtain such provisional or ancillary remedies before, during or after the pendency of any arbitration proceeding brought pursuant to this Option Agreement. Neither this exercise of self help remedies nor the institution or maintenance of an action for foreclosure or provisional or ancillary remedies shall constitute a waiver of the right of any party, including the claimant in any such action, to arbitrate the merits of the controversy or claim occasioning resort to such remedies.

8.2.6. If the Company has or hereafter may acquire any immunity, on the grounds of sovereignty or other similar grounds, from jurisdiction or any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution or otherwise) with respect to itself or its property, the Company hereby irrevocably waives such immunity in respect of its obligations under this Agreement.

8.3.    Language. This Option Agreement is being executed in four English original copies, and each of the Parties shall have two original copies.

8.4.    Notices. All notices, requests and other communications to any Party hereunder shall be in writing and shall be given to such Party at its address or facsimile number set forth in Article 8.7hereof or such other address or facsimile number as such Party may hereafter specify for the purpose by notice to the other Party hereto. Each such notice, request or other communication shall be effective (i) if given by facsimile transmission, when transmitted to the proper address and confirmed by telephone, (ii) if given by certified or registered air mail, when received or 72 hours after such communication is deposited in the mails, whichever is earlier, or (iii) if given by any other means, when delivered; provided that the Repurchase Notices to the Equity Fund under Article 2.3. shall not be effective until received.

8.5.    Amendments and Waivers. Any provision of this Option Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the Parties.

8.6.    Successors and Assigns. This Option Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, except that the Company may

11

not assign its rights hereunder or any interest herein without the prior written consent of the Equity Fund.

8.7.  Prerequisites of the Parties.
Media Development Equity Fund
45 West 21st Street, 4th floor
New York, NY 10010, USA
ph (1 212) 807 1304
fax (1 212) 807 0540
Attn:

Novi List
Zvonimirova 20a
Rijeka, zip Croatia 51000
ph (385 51) 65 00 12
fax (385 51) 65 00 32
Attn: Zdenko Mance, Director

8.8.  Entry into Force; Effect. This Option Agreement enters into force when duly executed by the Parties and shall remain in effect until the earlier of (a) the Equity Fund has sold all of its shares in the Company, or (b) December 31, 2012.

IN WITNESS WHEREOF, the Parties have caused this Option Agreement to be executed by their duly authorized representatives on the date first above written.

Signed for and on behalf of
Novi List, d.d., Rijeka, Croatia

By: _____
Zdenko Mance
Director

Signed for and on behalf of
Media Development Equity Fund, LLC
New York, N.Y., U.S.A.

By: _____
Kenneth Anderson
Chairman of the Board of Directors

»NOVI LIST« d.d.
Rijeka

# EXHIBIT A

Media Development Loan Fund ("MDLF"), Media Development Equity Fund, LLC ("Equity Fund"), Novi List d.d. ("Novi List") and Riječki list, d.o.o. ("Riječki list") (together, the "Parties") hereby agree as follows:

WHEREAS, Novi List is purchasing a new printing press and upgrading its printing facility;

WHEREAS, in order to consolidate the ownership of Novi List, the management of Novi List has established Riječki list to collect shares in Novi List;

WHEREAS, the members of Riječki list will transfer or have transferred all their shares of Novi List to Riječki list;

WHEREAS, Riječki list has purchased or will purchase the treasury shares held by Novi List;

WHEREAS, Riječki list intends to make an open offer to all other Novi List shareholders to purchase their shares in Novi List (the "Open Offer");

WHEREAS, in order to facilitate said consolidation of ownership, Riječki list wishes to borrow funds from MDLF for the purchase of Novi List shares;

WHEREAS, Equity Fund is fully owned and controlled by MDLF;

WHEREAS, in order to fund the upgrading of Novi List's printing facility and to further facilitate the consolidation of ownership in Novi List, Novi List wishes to issue new shares for purchase by Equity Fund, and possibly by Riječki list;

WHEREAS, MDLF wishes to provide Novi List the assistance described above in the form of two program related investments, one a loan to Riječki list from MDLF and the other an equity investment in Novi List by Equity Fund;

WHEREAS, to effectuate the two program related investments, the Parties intend to finalize a Credit Agreement between Riječki list and MDLF attached hereto as Exhibit 1 (the "Credit Agreement"), a Shareholders Agreement between Riječki list and Equity Fund attached hereto as Exhibit 2 (the "Shareholders Agreement"), a Share Subscription Agreement between Novi List and Equity Fund attached hereto as Exhibit 3 (the "Share Subscription Agreement"), and an Option Agreement (the "Option Agreement") between Novi List and Equity Fund attached hereto as Exhibit 4;

WHEREAS, to fund the purchase of the printing press, Novi List has entered into a Foreign Exchange Loan Facility and Guarantee Agreement dated August 19, 1999, with Raiffeisenbank Austria d.d, Soros Economic Development Fund ("SEDF"), Karlovački List d.o.o. and Adamić d.o.o. (the "RBA Agreement"); and

WHEREAS, for the benefit of Novi List, MDLF has guaranteed to SEDF that MDLF will reimburse to SEDF any funds it must pay pursuant to the guarantee provisions of the RBA Agreement;

THEREFORE,

A.    **Capital Increase**

1.    Subscription of Shares: Pursuant to a Share Subscription Agreement to be negotiated by Novi List and MDLF, Novi List will issue and Equity Fund will purchase 18,190 new shares (which will bring the total number of Novi List shares to 60,000). Equity Fund will pay 100 DEM per share, for a total of 1,819,000 DEM. The nominal value of the shares shall be 300 Croatian kunas.

2.    Option to Repurchase Shares: Equity Fund and Novi List will enter into an Option Agreement to be negotiated by the Parties, which will give Novi List an option to purchase up to 2/3 of the shares in Novi List to be purchased by Equity Fund under Section A.1 above. Novi List will not be able to exercise this

13

option before the later of (a) one year after Riječki list completes repayment of its loan from MDLF (described below) or (b) Novi List satisfying all its obligations under the RBA Agreement. The option will expire on December 31, 2010. Equity Fund will not be permitted to sell this portion of the shares until expiration of the option, unless the Option Agreement has terminated earlier. The purchase price for those shares shall be determined by the Parties on the following basis:

a.     Novi List and Equity Fund will agree on the market value of the shares at the time of Equity Fund's purchase and at the time Novi List exercises its option. The percentage change in market value over that period of time (the "Multiplier") will then be calculated.

b.     The Multiplier then will be multiplied by the actual price paid by Equity Fund for the shares to arrive at the Calculated Option Share Value, which shall be the Exercise Price to be paid by Novi List for the shares, except that the Exercise Price shall in no case fall below a Minimum Option Share Value or above a Maximum Option Share Value.

c.     To arrive at the Minimum Option Share Value, the actual price paid by Equity Fund per share shall be increased at a rate equal to LIBOR plus 2%, compounded annually over the period of Equity Fund's ownership. To arrive at the Maximum Option Share Value, the actual price paid by Equity Fund per share shall be increased at a rate equal to 10% compounded annually over that period.

3.     **Sale of Shares**: The Option Agreement shall provide that Equity Fund will be free to keep its ownership of the remaining 1/3 of its shares or to sell them as it sees fit. However, the Option Agreement will provide that Equity Fund may not sell before the earlier of (a) the date on which Novi List begins to exercise its option to purchase shares from Equity Fund or (b) June 30, 2009. Riječki list will have a right to approve the purchaser. Riječki list shall not unreasonably withhold such approval.

4.     **Access to Financial Records**: The Option Agreement shall provide that Equity Fund shall on demand be given reasonable access to Novi List's books and other financial records.

5.     **Approval of Equity Fund**: The Option Agreement shall provide that, until the earlier of (a) Equity Fund selling all its shares in Novi List or (b) two years after Novi List has fully exercised the option, but in any case no later than December 31, 2012, Novi List must obtain the written approval of Equity Fund and Riječki list in order to do any of the following:

    i)      amend the Charter of Novi List;
    ii)     reorganize Novi List;
    iii)    liquidate Novi List;
    iv)     increase Novi List's charter capital;
    v)      issue additional voting shares in Novi List;
    vi)     engage in transactions above 500,000 DEM which were not included into the Business Plan accepted by MDLF;
    vii)    enter into debts, liens, and other obligations above 500,000 DEM;

6.     **Termination of Option**: The Option Agreement shall provide that, if Riječki list or Novi List breaches the Credit Agreement, Shareholders Agreement or Option Agreement, or defaults under the RBA Agreement, Novi List's option and all restrictions on Equity Fund's sale of its shares will immediately terminate, and Equity Fund will be free to sell 100% of its shares as it sees fit.

7.     **Improvements to Accounting System**: The Option Agreement will require Novi List to change and improve its management accounting system to MDLF's satisfaction.

B.     **Loan to Riječki list**

14

1. **Loan Amount; Loan Purpose:** MDLF will loan up to EURO 970,000 to Riječki list (the "Loan") for the purchase of Novi List shares as follows:

   a. Prior to the Open Offer, Riječki list shall be acquiring from its members their shares in Novi List (the "Member Shares"), as well as all the treasury shares currently held by Novi List (the "Treasury Shares"). Payment for those share acquisitions shall not be due until after completion of the Open Offer.

   b. Riječki list initially shall use the entire Loan proceeds for part of the deposit for the Open Offer required under the Croatian Law on Takeover. The Loan proceeds then shall be drawn down for the purchase of Novi List shares pursuant to the Open Offer.

   c. Following conclusion of the Open Offer, Riječki list shall use any remaining Loan proceeds to pay for the Member Shares and the Treasury Shares.

   d. After conclusion of all the above purchases, the remainder of the Loan proceeds shall be used for the purchase of additional shares to be newly issued by Novi List (the "Additional Shares"). The Additional Shares shall be priced at 100 kuna per share, and their total cost shall be equal to the remainder of the Loan proceeds. To the extent the issuance of the Additional Shares would reduce Equity Fund's ownership in Novi List below 30%, the Additional Shares shall be divided among Riječki list and Equity Fund so as to maintain Equity Fund's 30% ownership interest. In such case, Riječki list shall immediately repay to MDLF the portion of the Loan proceeds equal to the cost of the Additional Shares to be purchased by Equity Fund.

2. **Interest Rate:** The loan will bear interest at a rate of 2% per annum.

3. **Repayment Schedule:** Assuming the full EURO 970,000 is borrowed, the principal repayment schedule will be:

| | |
|---|---|
| June 30, 2002 | EURO   48,500 |
| June 30, 2003 | EURO 145,500 |
| June 30, 2004 | EURO 194,000 |
| June 30, 2005 | EURO 194,000 |
| June 30, 2006 | EURO 194,000 |
| June 30, 2007 | EURO 194,000 |

This repayment schedule is intentionally coordinated with the timing of Novi List's option to purchase shares from Equity Fund, so that Novi List will not be able to exercise its option until after the loan has been fully repaid. The funds for Riječki list's repayment of principal and interest will come from dividends paid to Riječki list by Novi List, which will require Novi List to issue sufficient dividends to Riječki list to cover the repayments. The Credit Agreement will require Riječki list to obtain MDLF's approval before borrowing funds in any manner from any sources or increasing its capital.

4. **Early Repayment:** Riječki list will have the right to repay the loan early without penalties. All prepayments shall be applied first to installment payments of principal on the Loan in the inverse order of maturity and then to interest accrued but unpaid to the date of such prepayment. The minimum prepayment amount shall equal 20% of the full loan amount.

5. **Timing of Loan Disbursal:** Prior to the Open Offer.

6. **Security:** The loan will be secured by a pledge of the following Riječki list's shares in Novi List: (a) the shares purchased with the proceeds of the Loan, and (b) any shares transferred to Riječki list by its members.

7. **Default:** In addition to standard events of default, the Credit Agreement shall provide that a breach of the Option Agreement or Shareholders Agreement by Novi List or Riječki list, respectively, or default by Novi List under the RBA Agreement, shall constitute an Event of Default.

8. <u>Standard Credit Agreement Terms</u>:  The Credit Agreement shall be in the form of MDLF's standard credit agreement, similar to that previously executed by Novi List and MDLF.

**C.    Formation of Riječki list**

1. <u>Form</u>:  Riječki list will be formed as a Croatian Limited Liability Company.

2. <u>Controlling Transfers of Stock</u>:  Riječki list's Charter (the "Charter") shall provide that upon a member notifying Riječki list of an intent to sell or otherwise transfer stock, a meeting of members will be called to decide whether (a) to allow the sale or other transfer, (b) to have Riječki list purchase the stock, (c) to require that the stock be sold on a pro rata basis to all existing members who will meet the offered price, or (d) to a different third party than the one proposed by the seller.

3. <u>Pledge of Shares</u>:  The Charter shall prohibit members from pledging or otherwise hypothecating their shares without written authorization of Riječki list.

4. <u>Distribution of Revenues</u>:  The Charter shall provide that there will be no payment of dividends or other distribution of revenues (such as loans) to members and employees before payment of all currently due debts, and that distributions to members may be carried out only from net profits.

5. <u>Power to Decide How to Vote Shares in Novi List</u>:  The Charter shall provide that this power will rest with a simple majority of the Meeting of Members.

**D.    Shareholders Agreement**

1. <u>Shareholders Agreement</u>:  Riječki list and Equity Fund shall enter into a binding Shareholders Agreement that will govern their votes as shareholders of Novi List as set forth below.

2. <u>Editorial Policy</u>:  The Shareholders Agreement shall provide that Equity Fund will not interfere in the editorial policy of Novi List, but will support and vote for any editorial decisions of Riječki list.

3. <u>Voting</u>: The Shareholders Agreement shall provide that Equity Fund and Riječki list shall consult on all other matters requiring the vote of Novi List's shareholders, shall only vote their shares by mutual agreement, and shall always vote in unison.  The Shareholders Agreement shall, however, provide a mechanism for avoiding deadlock.

4. <u>Purchase of Shares Coming to Market</u>:  The Shareholders Agreement shall provide that, following completion of the Open Offer, when opportunities arise for purchasing additional shares from other shareholders, Riječki list and  Equity Fund shall each have the right to purchase 50% of the offered shares. Equity Fund's right to participate in these purchases shall terminate when it has sold all its shares in Novi List.  Equity Fund's sale of these shares will be subject to the same restrictions as in Paragraph A.3 above.

5. <u>Sale of Shares by Riječki list</u>:  The Shareholders Agreement shall provide that, until the earlier of (a) Equity Fund selling all its shares in Novi List or (b) two years after Novi List has fully exercised the option, but in any case no later than December 31, 2012, Riječki list will be prohibited from selling, pledging or otherwise transferring or hypothecating any shares it holds or comes to hold in Novi List without written authorization from Equity Fund.

6. <u>Voting Rights in Novi List</u>:  It is intended that  Equity Fund will have at least the same number of voting rights in Novi List as Riječki list.  However, depending on the number of Novi List shares that Riječki list is able to collect as Treasury Shares and from its shareholders, and purchase by means of the Open Offer, it is possible that Riječki list will hold more shares than Equity Fund.  The Shareholders Agreement shall provide that, in such a case, Riječki list will give Equity Fund a proxy to vote whatever number of Riječki list's shares in Novi List is required to achieve parity.

7.    <u>Nomination of Supervisory Board</u>:  The Shareholders Agreement shall provide that Riječki list and Equity Fund will use their votes as shareholders of Novi List to ensure that the Supervisory Board of Novi List shall have five members, that four members thereof, including the President, shall be nominated by Riječki list, and that one member thereof shall be nominated by Equity Fund.

**E.    General**

1.    <u>Additional Terms</u>:  The Parties agree that the purpose of this Memorandum of Understanding is to set forth their mutual understanding of the central elements of the matters addressed herein, and that the other details of these matters remain to be negotiated and finalized.  The Parties will enter into negotiations on the detailed terms of the Share Subscription, Option, Credit and Shareholders Agreements referenced herein.  Unless and until the Parties negotiate and agree on all the terms of said Agreements and execute them, neither party is bound by this agreement to effectuate any of the matters addressed herein.

2.    <u>Timing</u>:  The Parties agree to use their best efforts to finalize the terms of the Subscription, Option, Credit and Shareholders Agreements referenced herein no later than October 10, 1999.  All the attached agreements and any related documents shall be executed concurrently by Novi List, Riječki list, MDLF, and Equity Fund following any required approvals from the shareholders of Novi List and members of Riječki list.

**MEDIA DEVELOPMENT LOAN FUND**
**MEDIA DEVELOPMENT EQUITY FUND**

**NOVI LIST D.D.**
**RIJEČKI LIST D.O.O.**

## APPENDIX 1

## SIMULATION OF EXERCISE PRICE DETERMINATION
## PURSUANT TO SECTION 2.4 OF THE OPTION AGREEMENT

General assumption for the purpose of the simulation: the Equity Fund paid the Original Purchase Price on September 15, 1999, at DEM 100/share.

### Simulation 1: Option exercised as of December 31, 2010

**STEP I:    Determination of Calculated Option Share Value**

The Parties shall determine the market value of one Option Share at the beginning of the Valuation Period and at the end of the Valuation Period by using the Net Present Value Method in the format reasonably agreed to by the Parties. The percentage change between those two values shall equal the Multiplier. The Original Purchase Price shall then be multiplied by the Multiplier to arrive at the Calculated Option Share Value. For the purposes of this simulation, the Calculated Option Share Value is assumed to have been determined as:

- Variant A:    DEM 215.44
- Variant B:    DEM 258.64
- Variant C:    DEM 398.78

**STEP II:    Determination of Minimum Option Share Value**

For each one-year period commencing on September 15, LIBOR for purposes of this determination shall remain as a constant rate. That constant rate shall be the London interbank fixing rate for dollars as identified in the *Financial Times* column titled "World Interest Rates" on September 15 of each such one-year period. No later than October 31 of each such one-year period, the Equity Fund shall provide the Company with notice of the LIBOR rate for that year.

To arrive at the Minimum Option Share Value, the Original Purchase Price first shall be increased by a rate equal to LIBOR plus 2%, compounded annually, for each one-year period from September 15, 1999, through September 14, 2010. The resulting value then shall be increased over the remainder of the Valuation Period based on the effective daily rate as of September 15, 2010. The Minimum Option Share Value on December 31, 2010, determined by this method is DEM 235.44. See Table 1.

**STEP III:    Determination of Maximum Option Share Value**

To arrive at the Maximum Option Share Value, the Original Purchase Price first shall be increased by a rate of 10%, compounded annually, for each one-year period from September 15, 1999, through September 14, 2010. The resulting value then shall be increased over the remainder of the Valuation Period pro rata at an annual rate of 10%. The Maximum Option Share Value on December 31, 2010, determined by this method is DEM 293.40. See Table 2.

**STEP IV:    Determination of Exercise Price**

Based on the Calculated Option Share Value (Step One), the Exercise Price will be determined in the following way:

- Variant A: As the Calculated Option Share Value is lower than the Minimum Option Share Value, the Exercise Price shall equal the Minimum Option Share Value – DEM 235.44

- Variant B: The Exercise Price shall equal the Calculated Option Share Value – DEM 258.64, because the Calculated Option Share Value is between the Minimum and the Maximum Option Share Value.

- Variant C: As the Calculated Option Share Value is higher than the Maximum Option Share Value, the Exercise Price shall equal the Maximum Option Share Value – DEM 293.40

## Simulation 2: Option exercise on June 20, 2006

**STEP I:    Determination of Calculated Option Share Value**
The Parties shall determine the market value of one Option Share at the beginning of the Valuation Period and at the end of the Valuation Period by using the Net Present Value Method in the format reasonably agreed to by the Parties. The percentage change between those two values shall equal the Multiplier. The Original Purchase Price shall then be multiplied by the Multiplier to arrive at the Calculated Option Share Value. For the purposes of this simulation, the Calculated Option Share Value is assumed to have been determined as:

- Variant A:    DEM 159.59
- Variant B:    DEM 185.64
- Variant C:    DEM 298.78

**STEP II:    Determination of Minimum Option Share Value**
For each one-year period commencing on September 15, LIBOR for purposes of this determination shall remain as a constant rate. That constant rate shall be the London interbank fixing rate for dollars as identified in the *Financial Times* column titled "World Interest Rates" on September 15 of each such one-year period. No later than October 31 of each such one-year period, the Equity Fund shall provide the Company with notice of the LIBOR rate for that year.

To arrive at the Minimum Option Share Value, the Original Purchase Price first shall be increased by a rate equal to LIBOR plus 2%, compounded annually, for each one-year period from September 15, 1999, through September 14, 2005. The resulting value then shall be increased over the remainder of the Valuation Period based on the effective daily rate as of September 15, 2005. The Minimum Option Share Value on June 20, 2006, determined by this method is DEM 168.17. See Table 3.

**STEP III:    Determination of Maximum Option Share Value**
To arrive at the Maximum Option Share Value, the Original Purchase Price first shall be increased by a rate of 10%, compounded annually, for each one-year period from September 15, 1999, through September 14, 2005. The resulting value then shall be increased over the

remainder of the Valuation Period pro rata at an annual rate of 10%. The Maximum Option Share Value on June 20, 2006, determined by this method is DEM 190.49. See Table 4.

**STEP IV:    Determination of Exercise Price**

Based on the Calculated Option Share Value (Step One), the Exercise Price will be determined in the following way:

- Variant A: As the Calculated Option Share Value is lower than the Minimum Option Share Value, the Exercise Price shall equal the Minimum Option Share Value – DEM 168.17

- Variant B: The Exercise Price shall equal the Calculated Option Share Value – DEM 185.64, because the Calculated Option Share Value is between the Minimum and the Maximum Option Share Value.

- Variant C: As the Calculated Option Share Value is higher than the Maximum Option Share Value, the Exercise Price shall equal the Maximum Option Share Value – DEM 190.49

*table attached

## Simulation 1: Option Exercised on December 31, 2010

### Minimum Option Share Value

**Table 1** — LIBOR +2%

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | December 31, 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LIBOR on September 15 at | 5.750% | 5.938% | 6.250% | 6.344% | 6.094% | 5.781% | 5.719% | 5.594% | 5.531% | 5.750% | 5.969% | 5.656% | |
| Interest to applied for valuation | 7.7500% | 7.9375% | 8.2500% | 8.3438% | 8.0938% | 7.7813% | 7.7188% | 7.5938% | 7.5313% | 7.7500% | 7.9688% | 7.6563% | |
| Value of the Option Share in DM | 100.00 DM | 107.75 DM | 116.30 DM | 125.90 DM | 136.40 DM | 147.44 DM | 158.92 DM | 171.18 DM | 184.18 DM | 198.05 DM | 213.40 DM | 230.41 DM | 235.44 DM |

Daily rate on September 15, 2009    0.0202%

### Maximum Option Share Value

**Table 2** — 10%

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | December 31, 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Interest to applied for valuation | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | |
| Value of the Option Share in DM | 100.00 DM | 110.00 DM | 121.00 DM | 133.10 DM | 146.41 DM | 161.05 DM | 177.16 DM | 194.87 DM | 214.36 DM | 235.79 DM | 259.37 DM | 285.31 DM | 293.40 DM |

Daily rate on September 15, 2009    0.0261%

## Simulation 2: Option Exercised on June 20, 2006

### Minimum Option Share Value

**Table 3** — LIBOR +2%

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 June 20 2006 |
|---|---|---|---|---|---|---|---|---|
| LIBOR on September 15 at | 5.750% | 5.938% | 6.250% | 6.344% | 6.094% | 5.781% | 5.719% | |
| Interest to applied for valuation | 7.7500% | 7.9375% | 8.2500% | 8.3438% | 8.0938% | 7.7813% | 7.7188% | |
| Value of the Option Share in DM | 100.00 DM | 107.75 DM | 116.30 DM | 125.90 DM | 136.40 DM | 147.44 DM | 158.92 DM | 168.17 DM |

Daily rate on September 15, 2005    0.0204%

### Maximum Option Share Value

**Table 4** — 10%

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 June 20 2006 |
|---|---|---|---|---|---|---|---|---|
| Interest to applied for valuation | 10% | 10% | 10% | 10% | 10% | 10% | 10% | |
| Value of the Option Share in DM | 100.00 DM | 110.00 DM | 121.00 DM | 133.10 DM | 146.41 DM | 161.05 DM | 177.16 DM | 190.49 DM |

Daily rate on September 15, 2005    0.0261%

Note: When the value is calculated on September 15, a annual effective rate equals annual nominal rate
When the value is calculated on dates other than September 15, the share value shall be determined based on effective daily rate on previous September 15 for the number of days between previous September and value determination date.
For all calculations, all simulated values are calculated at the end of the period.