# Exhibit E

# CREDIT AGREEMENT

between

Riječki list, d.o.o.
Rijeka, Croatia

and

MEDIA DEVELOPMENT LOAN FUND
New York, NY, USA

28 October 1999

# CREDIT AGREEMENT

CREDIT AGREEMENT dated as of the date identified in Item 1 of Exhibit A hereto between the Borrower identified on the signature page hereto (the "Borrower") and MEDIA DEVELOPMENT LOAN FUND, a New York not-for-profit trust (the "Lender").

## W I T N E S S E T H:

WHEREAS, the Borrower has requested the Lender to make a term loan to the Borrower in the aggregate principal amount not to exceed the amount of the commitment of the Lender set forth in Item 2 of Exhibit A hereto, the proceeds of which are to be used for the purpose identified in Item 3 of Exhibit A hereto;

WHEREAS, the Lender is willing to make such loan to the Borrower for such purposes subject to the terms and conditions set forth herein;

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01. <u>Definitions</u>. The following terms, as used herein, have the following meanings:

"Affiliate" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, control shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the Management or policies of a Person, whether through the ownership of voting securities by contract or otherwise and controlled shall have a meaning correlative thereto.

"Agreements" means the MoU as defined in Item 3 of Exhibit A hereto, the Share Subscription Agreement between Media Development Equity Fund, LLC and Novi List, d.d., dated October 28, 1999, this Agreement and the Shareholders Agreement between Riječki List, d.o.o., and Media Development Equity Fund, dated October 28, 1999.

"Borrower" has the meaning specified therefor in the preamble hereto.

"Borrowing Date" means the date on which the Loan is made hereunder.

"Business Day" means a day on which commercial banks in both New York City and the location set forth in Item 4 of Exhibit A hereto are not required or authorized by law to close.

"Commitment" means the amount identified in Item 2 of Exhibit A hereto as such amount is reduced (or deemed to have been reduced) from time to time.

"Commitment Termination Date" has the meaning set forth in Section 2.07 hereof.

"Debt" of any Person means at any date, without duplication, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising in the ordinary course of business and payable in accordance with customary practices, (iv) obligations or liabilities created under any conditional sales contract or other title retention agreement with respect to property used and or acquired by such Person, even through the rights and remedies of the lessor, seller and/or lender thereunder are limited to repossession of such property, (v) all obligations of such Person as lessee under capital leases, (vi) all Debt of others secured by a Lien on any asset of such Person, whether or not such Debt is assumed by such Person, and (vii) all Debt of others Guaranteed by such Person, and (viii) all liabilities in respect of letters of credit, acceptances and similar obligations created for the account of such Person.

"Default" means any condition or event which, which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Amount" means the amount set forth in Item 24 of Exhibit A hereto.

"Default Rate" means, for any day, a rate per annum equal to the rate set forth in Item 5 of Exhibit A hereto.

"Dollars" and the symbol "$" means the lawful currency of the United States of America.

"Effective Date" means the date that this Agreement has been executed by the Borrower and the Lender.

"Event of Default" has the meaning set forth in Section 7.01.

3

"Financial Statements" means the statement(s) identified in Item 8 to Exhibit A hereto.

"Governmental Authority" means the United States or any state or political subdivision thereof or any foreign nation or political subdivision thereof, any entity, body or authority exercising executive, legislative, judicial, regulatory or administrative functions of, or pertaining to, government in the United States (or any state or political subdivision thereof) or any foreign nation or any political subdivision thereof, including, without limitation, any central bank or other governmental or quasi-governmental authority exercising control over banks or other financial institutions, and any corporation or other entity or authority owned or controlled (through stock or capital ownership or otherwise) by any of the foregoing.

"Guarantee" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

"Investment" means any investment in any Person, whether by means of share purchase, capital contribution, loan, time deposit or otherwise.

"Lender" has the meaning specified therefor in the preamble hereto.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset. For the purposes of this Agreement, a Person shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such asset.

"Loan" means the loan made by the Lender to the Borrower under this Agreement.

"Loan Documents" means this Agreement, the Note, the additional documents described in Item 9 of Exhibit A hereto and any guaranty, security agreement, pledge agreement and all other applications, instruments, documents and agreements executed and delivered pursuant to this Agreement.

## ARTICLE II

## THE LOAN

SECTION 2.01. <u>Making the Loan</u>. Subject to the terms and conditions hereinafter set forth including the satisfaction of the applicable conditions set forth in Article III hereof, the Lender agrees to make a Loan to the Borrower at any time occurring on or after the Effective Date and on or prior to the Commitment Termination Date in an aggregate principal amount not to exceed the Commitment. The Loan shall be made in one drawing or multiple drawings as set forth in Item 26 of Exhibit A hereto. Each drawing under the Loan shall be made on notice delivered by the Borrower to the Lender not later than 10:00 a.m. at least three Business Days prior to the proposed Borrowing Date. Such notice (the "Notice of Borrowing") shall be by telephone, telecopy or telex, confirmed immediately in writing, in substantially the form of Exhibit C and shall specify therein (i) the date that the drawing under the Loan shall be made, which shall be a Business Day, (ii) the amount of the drawing under the Loan, and (iii) the use of proceeds of such drawing under the Loan. The Borrowing Notice shall be irrevocable and binding on the Borrower. No amount paid or repaid by the Borrower in respect of the Loan may be reborrowed. The amount of such Loan shall be made available to the Borrower, in Dollars, in accordance with the instructions identified in Item 12 of Exhibit A hereto.

SECTION 2.02. <u>Repayment; the Note</u>.

(a)    The Borrower will repay the unpaid principal amount of the Loan on the date(s) and in the amounts set forth in Item 13 of Exhibit A hereto, provided that all unpaid principal and all accrued and unpaid interest on the Loan shall be due and payable on the Maturity Date. The obligation of the Borrower to repay the Loan shall be evidenced by a single Note payable to the order of the Lender in a principal amount equal to the Commitment.

(b)    The Lender shall record, and prior to any transfer of the Note shall endorse on the schedules forming a part thereof appropriate notations to evidence, the date and amount of the Loan made by it and the date and amount of each payment of principal made by the Borrower with respect thereto, provided that the failure of the Lender to make any such recordation or endorsement shall not affect the obligations of the Borrower hereunder or under the Note. The Lender is hereby irrevocably authorized by the Borrower to endorse the Note and to attach to and make a part of the Note a continuation of any such schedule as and when required.

SECTION 2.03. <u>Interest</u>.

6

(a)     The Borrower will pay interest on the unpaid principal amount of the Loan, from the Borrowing Date until such principal amount shall be paid in full, at a rate per annum equal to the rate set forth in Item 6 of Exhibit A hereto.

(b)     Any amount of principal and, to the extent permitted by law, interest and fees that are not paid when due (whether at stated maturity, by acceleration or otherwise) shall bear interest, from the date on which such amount is due until such amount is paid in full, payable on demand, at a rate per annum equal at all times to the Default Rate.

(c)     Interest accrued on the Loan shall be payable (i) on the dates set forth in Item 7 of Exhibit A hereto and (ii) on any date on which the Loan is paid, whether by prepayment, due to acceleration or otherwise.

SECTION 2.04.  Prepayments.  Except as otherwise provided below, the Borrower may prepay, without premium or penalty, all or any portion of the Loan, upon written notice by the Borrower to the Lender by 10:00 a.m. at least three Business Days prior to the date of prepayment. Any notice of prepayment given to the Lender under this Section 2.04 shall be irrevocable and shall specify the date of prepayment and the aggregate amount of the prepayment. If any such notice is given, the amount of the prepayment specified in such notice shall be due and payable by the Borrower on the date specified therein, together with accrued interest to such date on such amount. All prepayments shall be in the minimum amount equal to 20% of the value of the Loan or more, and shall be applied to the remaining principal installments of the Loan in the order as set forth in Item 14 of Exhibit A hereto.

SECTION 2.05.  Fees.  The Borrower shall pay to the Lender the nonrefundable fees in the amount(s) and on the date(s) set forth in Item 15 of Exhibit A hereto.

SECTION 2.06.  Payments and Computations.

(a)     The Borrower will make each payment hereunder and under the Note not later than 2:00 p.m. New York City time on the day when due in Dollars and immediately available funds to the Lender at its address referred to on the signature page hereof or at any other address of the Lender specified by the Lender by notice to the Borrower.

(b)     All computations of interest or fees shall be made by the Lender on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or fee is payable. The interest shall be compounded on a monthly basis. Whenever any payment hereunder or under the Note shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest.

SECTION 2.07. <u>Mandatory Reduction of Commitment</u>. Unless sooner terminated pursuant to the terms of this Agreement, the Commitment shall be terminated in full on the date identified in item 16 of Exhibit A hereto (the "Commitment Termination Date").

SECTION 2.08. <u>Taxes</u>. All payments made by the Borrower hereunder, under the Note or under any Loan Document will be made without setoff, counterclaim, deduction or other defense. All such payments shall be made free and clear of and without deduction for any present or future income, franchise, sales, use, excise, stamp or other taxes, levies, imposts, deductions, charges, fees, withholding, restrictions or conditions of any nature now or hereafter imposed, levied, collected, withheld or assessed by any jurisdiction (whether pursuant to the United States Federal, state, local or foreign law) or by any political subdivision or taxing authority thereof or therein, and all interest, penalties or similar liabilities, excluding taxes on the overall net income of the Lender (such nonexcluded taxes are hereinafter collectively referred to as the "Taxes"). If the Borrower shall be required by law to deduct or to withhold any Taxes from or in respect of any amount payable hereunder, (i) the amount so payable shall be increased to the extent necessary so that after making all required deductions and withholdings (including Taxes on amounts payable to the Lender pursuant to this sentence) the Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Borrower shall make such deductions or withholdings and (iii) the Borrower shall pay the full amount deducted or withheld to the relevant taxation authority in accordance with applicable law. Whenever any Tax is payable by the Borrower, as promptly as possible thereafter the Borrower shall send the Lender an official receipt showing payment. If no taxes are payable in respect of any payment hereunder or under the Note, the Borrower will furnish to the Lender a certificate from each appropriate taxing authority, or an opinion of counsel acceptable to the Lender, in either case stating that such payment is exempt from or not subject to Taxes. In addition, the Borrower agrees to pay any present or future taxes, charges or similar levies which arise from any payment made hereunder or from the execution, delivery, performance, recordation or filing of, or otherwise with respect to, this Agreement, the Note or any other Loan Document (hereinafter referred to as "Other Taxes"). The Borrower will indemnify the Lender for the full amount of Taxes or Other Taxes (including any Taxes or Other Taxes on amounts payable to the Lender under this paragraph) paid by the Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, upon written demand by the Lender therefor. In the event that this Section 2.08 is invalid, unenforceable or illegal, the parties shall consult with each other and attempt to agree on a provision which affords the same economic benefits to the Lender, <u>provided</u> that if the parties do not agree on such a provision, the Loan shall become due and payable on a date specified by the Lender by written notice to the Borrower.

ARTICLE III

CONDITIONS TO LENDING

SECTION 3.01. <u>Conditions Precedent to the Loan</u>. The obligation of the Lender to make the Loan is subject to the fulfillment on the Borrowing Date in a manner satisfactory to the Lender, of each of the following conditions precedent:

(a)     <u>Representations and Warranties; No Event of Default</u>.  The representations and warranties contained in Article IV of this Agreement shall be true and correct in all material respects on and as of the Borrowing Date as though made on and as of such date; and no Default or Event of Default shall have occurred and be continuing on the Borrowing Date or would result from the making of the Loan.

(b)     <u>Delivery of Documents</u>.  The Lender shall have received on or before the Borrowing Date the following, each in form and substance satisfactory to the Lender and, unless indicated otherwise, dated the initial Borrowing Date:

(i)     the Note, duly executed by the Borrower, and each of the other Loan Documents described in Item 9 of Exhibit A hereto duly executed by the parties thereto;

(ii)     a copy of the resolutions adopted by the Management Board of the Borrower, certified by an authorized officer thereof, authorizing (A) the borrowing hereunder and the transactions contemplated by this Agreement, and (B) the execution, delivery and performance by the Borrower of this Agreement and the Note and the execution and delivery of the other Loan Documents to be delivered by it in connection herewith and therewith;

(iii)     a certificate of an authorized officer, or representative of the Borrower, certifying the names and true signatures of the officers, or representatives of the Borrower authorized to sign this Agreement, the Note and the other Loan Documents to be executed and delivered by the Borrower in connection herewith;

(iv)     a certificate of an officer or representatives of the Borrower as to the incumbency and signature of the officer or representatives signing the certificate referred to in clause (iii) above;

(v)     the organizational documents described in Item 17 of Exhibit A hereto;

(vi)     a certificate of the Borrower certifying that (A) the representations and warranties contained in Article IV of this Agreement are true and correct in all material respects on and as of such date as though made on and as of such

date, and (B) no Default or Event of Default has occurred and is continuing or would result from the making of the Loan to be made on such date; and

(vii)    not later than 10:00 a.m. at least three Business Days prior to the Borrowing Date, the Borrowing Notice pursuant to Section 2.01 hereof with respect to the Loan.

(c)    Legality.  The making of the Loan shall not contravene any law, rule or regulation applicable to the Lender.

(d)    Payment of Fees, Etc.  The Borrower shall have paid on or before the Effective Date all fees, costs, expenses and taxes then payable by the Borrower pursuant to Section 8.03 of this Agreement.

(e)    Registration with the National Bank.  If required by the Lender, the Borrower shall have delivered to the Lender evidence, in form and substance reasonably satisfactory to the Lender, that this Agreement has been duly registered with the National Bank of Croatia, permitting the Borrower to make all payments required by the terms of this Agreement in Dollars.

(f)    Additional Conditions Precedent.  The Borrower shall also be required to satisfy the additional conditions precedent set forth in Item 18 of Exhibit A hereto.  In addition, all legal matters incident to the making of the Loan shall be reasonably satisfactory to the Lender and its counsel.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lender as follows:

SECTION 4.01.  Existence and Power.  The Borrower and each of its Subsidiaries is a corporation or other organization (as indicated below the Borrower's signature on this Agreement) duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or other organization (as indicated below the Borrower's signature on this Agreement), and has all corporate or other organization powers and all material governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted.  No part of the Borrower or its business is owned by any nation or government or any political subdivision thereof or thereto.

SECTION 4.02.  Organization and Governmental Authorization; Contravention.  The execution, delivery and performance by the Borrower of this Agreement and the Note and each other Loan Document to which it is a party are within the Borrower's powers and have been duly authorized by all necessary action.  The

10

execution, delivery, performance and enforcement of this Agreement and the Note and each other Loan Document to which the Borrower is a party require no actions by or in respect of, or filing with, any Governmental Authority, and do not and will not contravene, or constitute a default under, any provision of applicable law or regulation or of the certificate of incorporation or by-laws or other organization document of the Borrower or of any agreement, judgment, injunction, order, decree or other instrument binding upon the Borrower or result in the creation or imposition of any Lien on any asset of the Borrower.

SECTION 4.03. Binding Effect. This Agreement constitutes a valid and binding agreement of the Borrower and the Note constitutes a valid and binding obligation of the Borrower, all enforceable against the Borrower in accordance with its terms, except as (i) such enforceability may be limited by bankruptcy, insolvency and other similar laws affecting the enforcement of creditors' rights generally, and (ii) the availability of equitable remedies may be limited by equitable principles of general applicability.

SECTION 4.04. Financial Information.

(a)    The Financial Statements, a copy of which have been delivered to the Lender, fairly present, in conformity with internationally accepted accounting principles, the financial position of the Borrower as of such date and its results of operations and changes in financial position for such fiscal year or portion thereof.

(b)    Since the date of such Financial Statements, there has been no material adverse change in the business, financial position, results of operations or prospects of the Borrower.

SECTION 4.05. Litigation; Compliance with Laws.

(a)    There is no action, suit or proceeding pending against, or to the knowledge of the Borrower threatened against or affecting, the Borrower or any of its Subsidiaries before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely affect the business, financial position or results of operations of the Borrower or which in any manner draws into question the validity of this Agreement or the Note.

(b)    Neither the Borrower nor any of its Subsidiaries is in violation of any law or statute, or in default with respect to any judgment, writ, injunction, decree, rule or regulation of any court or governmental agency or instrumentality, or any securities or commodities exchange, where such violation or default would have a materially adverse effect on the business, financial condition or operations of the Borrower, or materially impair the validity or enforceability of, or the ability of the Borrower to perform its obligations under, this Agreement or the Note.

11

SECTION 4.06.  Taxes, Etc.  All tax returns and other reports required by applicable law to be filed by the Borrower have been filed, and all taxes, assessments and other governmental charges imposed upon the Borrower or any property of the Borrower and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof.  There are no taxes imposed by the country of the Borrower's organization either (a) on or by virtue of the execution or delivery of this Agreement, the Note or any other Loan Document, or (b) on any payment to be made by the Borrower or on any obligation or undertaking of the national bank of such country pursuant to any foreign exchange undertaking.

SECTION 4.07.  Subsidiaries.  Schedule I contains a complete and correct list of all Subsidiaries of the Borrower on the Borrowing Date.

SECTION 4.08.  Federal Reserve Regulations.

(a)      No part of the proceeds of the Loan will be both (i) secured directly or indirectly by any margin stock (as defined in Regulation X) and (ii) used, whether directly or indirectly, and whether immediately, incidentally or ultimately (A) to purchase or carry any margin stock, or (B) to extend credit to others for the purpose of purchasing or carrying any margin stock or to refund indebtedness originally incurred for such purpose.

(b)      All representations and warranties set forth in this Section 4.08 are made for determining compliance with, and shall be interpreted in accordance with, Regulation G and Regulation X.

SECTION 4.09.  Pari Passu Debt.  The indebtedness of the Borrower evidenced by this Agreement and the Note rank at least pari passu with all other Debt of the Borrower existing on the Borrowing Date.

SECTION 4.10.  Use of Proceeds.  The proceeds of the Loans will be used by the Borrower for the purpose identified in Item 3 of Exhibit A hereto.

SECTION 4.11.  Title to Properties.  The Borrower has good and marketable title to all of its properties and assets, free and clear of all Liens, security interests and other charges and encumbrances and other types of preferential arrangements except such as are permitted by Section 6.01 hereof.

SECTION 4.12.  Adverse Agreements, Etc.; Existing Debt.

(a)      The Borrower is not a party to any agreement or instrument, or subject to any charter or other corporate restriction or any judgment, order, regulation, ruling or other requirement of a court or other governmental authority or regulatory body, which materially adversely affects, or, to the best knowledge of the

Borrower, in the future is reasonably likely to materially adversely affect, the condition or operations, financial or otherwise, of the Borrower or the ability of the Borrower to perform its obligations under any Loan Document to which it is or will be a party.

(b)    All Debt of the Borrower existing on the Borrowing Date is shown on Schedule II.

SECTION 4.13.  No Recordation Necessary.  This Agreement, the Note and each other Loan Document are in proper legal form under the law of the country of the Borrower's organization for the enforcement hereof or thereof against the Borrower under the law of the country of the Borrower's organization, and to ensure the legality, validity, enforceability, priority or admissibility in evidence of this Agreement, the Note and each other Loan Document it is not necessary that this Agreement, the Note, any Loan Document or any other document be filed, registered or recorded with, or executed or notarized before, any court or other authority in the country of the Borrower's organization or that any registration charge or stamp or similar tax be paid on or in respect of this Agreement, the Note, any Loan Document or any other document.

SECTION 4.14.  Full Disclosure.  There is no fact which the Borrower has not disclosed in writing to the Lender which materially adversely affects or, as far as the Borrower can now foresee, will materially adversely affect the properties, affairs, prospects, or condition (financial or otherwise) of the Borrower or the ability of the Borrower to perform its obligations pursuant to this Agreement any other Loan Document or to pay the principal or interest on the Loan when due.  No representation or warranty by the Borrower contained in this Agreement, the Note, any other Loan Document, or in any certificate or other document furnished by the Borrower pursuant to any of the Loan Documents contains any untrue statement of material fact or omits to state a material fact necessary to make such representation or warranty not misleading in light of the circumstances in which it was made.

SECTION 4.15.  Purpose of the Loan.  The Borrower represents and warrants that none of the proceeds of this Loan will be used for any of the following purposes:

(a) attempting to influence legislation, other than (i) performing or making available non-partisan analysis, article, research or study, or (ii) by examining or discussing broad social, economic and  similar problems;

(b) partisan election campaign activities, including carrying out voter registration drives;

(c) any other purpose than those specified in section 170(c)(2)(B) of the United States Internal Revenue Code;

(d) making grants to individuals or other organizations (except as agreed to by MDLF in conformity with the US tax law).

If the borrower fails to use the proceeds of the Loan for the purposes as identified in Item 3 of Exhibit A hereto, then such proceeds must be returned to the Lender. The Borrower agrees to submit to the Lender periodic detailed financial reports as required by Item 8 of Exhibit A hereto during the term of the Loan.

SECTION 4.16. <u>Additional Representations</u>. In addition, the Borrower represents and warrants as to each of the items set forth in Item 19 of Exhibit A hereto.


ARTICLE V

AFFIRMATIVE COVENANTS

The Borrower agrees that, so long as the Lender has any Commitment hereunder or any amount payable under the Note remains unpaid:

SECTION 5.01. <u>Legal Existence</u>. The Borrower will at all times do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence.

SECTION 5.02. <u>Businesses and Properties</u>. The Borrower will at all times do or cause to be done, and cause each of its Subsidiaries to do or cause to be done, all things necessary to preserve, renew and keep in full force and effect the rights, licenses, permits, franchises and trade names material to the conduct of its business (except to the extent that the Borrower or the Subsidiary, as the case may be, shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower or the Subsidiary, as the case may be); and comply, and cause each of its Subsidiaries to comply, in all material respects with all laws and regulations applicable to the operation of such business whether now or hereafter in effect and with all other applicable laws and regulations the noncompliance with which would have a material adverse effect on the business, financial condition or operations of the Borrower and its Subsidiaries taken as a whole or would affect the Borrower's ability to perform its obligations under this Agreement and the Note.

SECTION 5.03. <u>Compliance with Laws, Obligations and Taxes</u>. The Borrower will comply in all material respects with all applicable laws, rules, regulations and orders. The Borrower will pay and discharge, and cause each of its Subsidiaries to pay and discharge, promptly when due all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise, which, if unpaid, might give rise to Liens upon such

14

properties or any part thereof; provided, however, that neither the Borrower nor any Subsidiary shall be required to pay and discharge or to cause to be paid and discharged any such tax, assessment, charge, levy or claims so long as (a) the validity or amount thereof shall be contested in good faith by appropriate proceedings or where the failure to pay such tax, assessment, charge, levy or claim would not (i) have a material adverse effect on the business, financial condition or operations of the Borrower and its Subsidiaries taken as a whole, (ii) result in the violation of Section 5.01 hereof, or (iii) give rise to a Lien upon the properties of the Borrower or its Subsidiaries or any part thereof, and (b) the Borrower or such Subsidiary shall, to the extent required by accounting principles accepted in Croatia applied on a consistent basis, have set aside on its book adequate reserves with respect thereto.

SECTION 5.04. Maintaining Records; Access to Properties and Inspections. The Borrower will:

(a)    Maintain financial accounting records in accordance with accounting principles applicable in Croatia.

(b)    Upon reasonable notice, at all reasonable times and as often as the Lender may request, permit any authorized representative designated by the Lender to visit the Borrower and inspect the financial accounting records of the Borrower relating to this Agreement, the Note and the financial condition of the Borrower for the purpose of determining compliance with this Agreement and the Note, and permit any authorized representative designated by the Lender to discuss the affairs, finances and condition of the Borrower or any Subsidiary with the Borrower's authorized financial officer or representative as the Borrower shall deem appropriate.

SECTION 5.05. Information. The Borrower will deliver to the Lender:

(a)    the financial statements, certificates and other information described in Item 20 of Exhibit A thereto;

(b)    as soon as possible and in any event within five days after the occurrence of (A) any Default or Event of Default, or (B) a material adverse change in the condition or operations, financial or otherwise, of the Borrower, a certificate of the chief financial officer, the chief accounting officer, or authorized representative of the Borrower setting forth the details thereof and the action which the Borrower is taking or proposes to take with respect thereto;

(c)    promptly upon the mailing thereof to the stockholders or partners of the Borrower generally, copies of all financial statements, reports and proxy statements so mailed;

(d)    promptly after the commencement thereof but in any event not later than five Business Days after service of process with respect thereto on, or the obtaining of knowledge thereof by, the Borrower, notice of each action, suit, proceeding

15

or claim before any court or other Governmental Authority or other regulatory body or any arbitrator against the Borrower; and

(e)    from time to time such additional information regarding the financial position or business of the Borrower and its Subsidiaries as the Lender may reasonably request.

SECTION 5.06.  Pari Passu Debt.  The indebtedness of the Borrower evidenced by this Agreement and the Note shall at all times rank at least pari passu with all Debt of the Borrower existing on the Borrowing Date or incurred subsequent to the Borrowing Date.

SECTION 5.07.  Maintenance of Insurance.  The Borrower will maintain with responsible and reputable insurance companies or associations insurance (including, without limitation, comprehensive general liability and hazard insurance) with respect to its properties and business, in such amounts and covering such risks, as is required by any Governmental Authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated.

SECTION 5.08.  Maintenance of Properties, Etc.  The Borrower will maintain and preserve all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder.

SECTION 5.09.  Maintenance of Process Agent.  The Borrower shall maintain in New York, New York, a Person acting as agent to receive on its behalf and on behalf of its property service of process and to be capable of discharging the functions of the New York Process Agent set forth in Section 8.10.

SECTION 5.10.  Further Assurances.  The Borrower shall do, execute, acknowledge and deliver, at the sole cost and expense of the Borrower all such further acts, deeds, conveyances, mortgages, assignments, estoppel certificates, notices of assignment, transfers and assurances as the Lender may require from time to time in order to better assure, convey, grant, assign, transfer and confirm unto the Lender the rights now or hereafter intended to be granted to Lender under this Agreement, any Loan Document or any other instrument under which the Borrower may be or may hereafter become bound to convey, mortgage or assign to the Lender for carrying out the intention or facilitating the performance of the terms of the Agreement.  The Borrower hereby, appoints the Lender its attorney-in-fact to execute, acknowledge and deliver for and in the name of the Borrower any and all of the instruments mentioned in this Section 5.10, and this power, being coupled with an interest, shall be irrevocable as long as any part of the obligations of the Borrower under this Agreement remains unpaid.

SECTION 5.11.  Additional Affirmative Covenants.  The Borrower shall comply with the additional Affirmative Covenants set forth in Item 20 of Exhibit A hereto.

## ARTICLE VI

## NEGATIVE COVENANTS

The Borrower agrees that, so long as the Lender has any Commitment hereunder or any amount payable under the Note remains unpaid:

SECTION 6.01.  Liens, Etc.  The Borrower will not and will not permit its Subsidiaries to create or suffer to exist any Lien, upon or with respect to any of its properties, rights or other assets, whether now owned or hereafter acquired, or assign or otherwise transfer any right to receive income other than:

(i)    Liens existing on the date hereof, as set forth in Schedule III hereto;

(ii)    (A) Liens on equipment acquired by the Borrower in the ordinary course of its business to secure the purchase price of such property or Debt incurred solely for the purpose of financing the acquisition of such property, or (B) Liens existing on such property at the time of its acquisition, provided, in the case of Liens referred to in clauses (A) and (B) above, that (1) no such Lien shall extend to or cover any property of the Borrower other than the property so acquired, and (2) the principal amount of the Debt secured by any such Lien shall not exceed the cost of the property so acquired;

(iii)    Liens for taxes, assessments or governmental charges or levies to the extent that the payment thereof shall not be required by Section 5.03 hereof;

(iv)    Liens created by operation of law, such as materialmen's liens, mechanics' liens and other similar Liens, arising in the ordinary course of business and securing claims the payment of which shall not be required by Section 5.03 hereof;

(v)    deposits, pledges or Liens securing (A) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, (B) the performance of bids, tenders, leases, contracts (other than for the payment of money) and statutory obligations, or (C) obligations on surety or appeal bonds, but only to the extent such deposits, pledges or Liens are incurred or otherwise arise in the ordinary course of business and secure obligations which are not past due;

(vi)    restrictions on the use of real property and irregularities in the title thereto which do not (A) secure obligations for the payment of money or (B)

materially impair the value of such property or its use by the Borrower in the normal conduct of the Borrower's business; and

(vii)    Liens identified in Item 21 of Exhibit A hereto.

SECTION 6.02.  Debt.  The Borrower will not create, incur or suffer to exist, or permit any of its Subsidiaries to create, incur or suffer to exist, any Debt, other than:

(i)    Debt created under the Loan Documents;

(ii)    Debt existing on the date hereof, as set forth in Schedule II hereto;

(iii)    Debt secured by Liens permitted by Section 6.01(ii);

(iv)    Debt permitted by Section 6.06; and

(v)    Debt identified in Item 22 of Exhibit A hereto.

SECTION 6.03.  Merger, Consolidation, Sale of Assets, Etc.  The Borrower will not:

(A)    Merge or consolidate with any Person, or permit any of its Subsidiaries to merge or consolidate with, any Person; provided, however, that any Subsidiary of the Borrower may be merged into the Borrower or another such Subsidiary, or may consolidate with another such Subsidiary, so long as (i) no other provision of this Agreement would be violated thereby and (ii) the Borrower gives the Lender at least 30 days' prior notice of such merger or consolidation.

(B)    Sell, assign, lease or otherwise transfer or dispose of, or permit any of its Subsidiaries to sell, assign, lease or otherwise transfer or dispose of, whether in one transaction or in a series of related transactions, any substantial portion of its properties, rights or other assets (whether now owned or hereafter acquired) to any Person; provided, however, that any Subsidiary of the Borrower may sell, assign or otherwise transfer its properties, rights or other assets to the Borrower or another such Subsidiary so long as (i) no other provision of this Agreement would be violated thereby and (ii) the Borrower gives the Lender at least 30 days' notice of such sale, assignment or other transfer.

SECTION 6.04.  Change in Nature of Business.  The Borrower will not make any material change in the nature of its business or operations as carried on at the date hereof.

SECTION 6.05.  Investments, Etc.  The Borrower will not make, incur, assume or suffer to exist, or permit any of its Subsidiaries to make, incur, assume or suffer to exist, any loan or advance to or investment in any Person or purchase or

otherwise acquire, or permit any of its Subsidiaries to purchase or otherwise acquire, any capital stock, properties, assets or obligations of, or any interest in, any Person, other than:

(i)    Permitted Investments; and

(ii)    investments existing on the date hereof, as set forth in Schedule IV hereto.

SECTION 6.06. <u>Guarantees, Etc.</u>  The Borrower will not assume, Guarantee, indorse or otherwise become or continue to be directly or contingently liable, or permit any of its Subsidiaries to assume, Guarantee, indorse or otherwise become or continue to be directly or contingently liable (including, without limitation, liable by way of agreement, contingent or otherwise, to purchase, to provide funds for payment, to supply funds to or otherwise invest in the debtor or otherwise to assure any creditor against loss), in connection with any Debt of any other Person, other than:

(i)    Any Guarantees from time to time existing in favor of the Lender; and

(ii)    Guarantees existing on the date hereof, as set forth in Schedule V hereto.

SECTION 6.07. <u>Transactions with Affiliates.</u>  The Borrower will not enter into or be a party to, or permit any of its Subsidiaries to enter into or be a party to, any transaction with any Affiliate of the Borrower except as otherwise provided herein or in the ordinary course of business in a manner and to an extent consistent with past practices and necessary or desirable for the prudent operation of its business for fair consideration and on terms no less favorable to the Borrower or such Subsidiary as are available from unaffiliated third parties.

SECTION 6.08. <u>Charter Amendments.</u>  The Borrower shall not amend its organizational documents in any manner which would jeopardize its ability to perform its obligation under the Loan Documents.

SECTION 6.09. <u>Additional Negative Covenants.</u>  The Borrower shall comply with the additional covenants set forth in Item 23 of Exhibit A hereto.


ARTICLE VII

EVENTS OF DEFAULT

SECTION 7.01. <u>Events of Default.</u>  If one or more of the following events ("Events of Default") shall have occurred and be continuing:

19

    (a)    the Borrower shall fail to pay when due any principal of or interest on any Loan or any other amount payable hereunder;

    (b)    the Borrower shall fail to observe or perform any covenant contained in Article V or Article VI of this Agreement;

    (c)    the Borrower shall fail to observe or perform any covenant or agreement contained in this Agreement or any other Loan Document (other than those covered by clause (a) or (b) above) for 15 days after written notice thereof has been given to the Borrower by the Lender;

    (d)    any representation, warranty, certification or statement made by the Borrower in this Agreement or in any certificate, financial statement or other document delivered pursuant to this Agreement shall prove to have been incorrect in any material respect when made (or deemed made);

    (e)    the Borrower or any Subsidiary shall fail to make any payment in respect of any Debt in an aggregate principal amount exceeding the Default Amount (other than the Debt evidenced by the Note) when due or within any applicable grace period or any event or condition shall occur which results in the acceleration of the maturity of any Debt of the Borrower or any Subsidiary in an aggregate principal amount exceeding the Default Amount or enables (or, with the giving of notice or lapse of time or both, would enable) the holder of such Debt or any Person acting on such holder's behalf to accelerate the maturity thereof;

    (f)    the Borrower or any Subsidiary shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or the taking of possession of any substantial part of its property by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due, or shall take any action to authorize any of the foregoing;

    (g)    an involuntary case or other proceeding shall be commenced against the Borrower or any Subsidiary seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of 30 days; or an order for relief shall be entered against the Borrower or any Subsidiary under any bankruptcy or insolvency laws as now or hereafter in effect;

20

(h)    any seizure, vesting or intervention by or under authority of a government shall occur by which the Borrower's management is displaced or its authority is curtailed or the Borrower's assets are confiscated, seized or attached;

(i)    a judgment or order for the payment of money in excess of the Default Amount shall be rendered against the Borrower or any Subsidiary and such judgment or order shall continue unsatisfied and unstayed for a period of 15 days;

(j)    any provision of any Loan Document shall at any time for any reason be declared to be null and void, or the validity or enforceability thereof shall be contested by any Person, or a proceeding shall be commenced by any Person, or by any Governmental Authority or other regulatory body having jurisdiction over the Borrower, seeking to establish the invalidity or unenforceability thereof, or the Borrower shall deny that the Borrower has any liability or obligation purported to be created under any Loan Document;

(k)    the government of the country of the Borrower's organization or any agency thereof shall declare a moratorium on the payment of indebtedness which shall include or be applicable to the indebtedness of the Borrower under this Agreement;

(l)    any governmental regulatory authority of the country of the Borrower's organization shall take or institute action which will, in the opinion of the Lender, adversely affect the Borrower's condition, operations or ability to repay the Loans; or

(m)    any event identified in Item 25 of Exhibit A hereto;

then, and in every such event, the Lender may by notice to the Borrower (i) terminate the Commitment and it shall thereupon terminate, (ii) declare the Note (together with accrued interest thereon) to be, and the Note shall thereupon become, immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; provided that if any of the Events of Default specified in clause (f) or (g) above occurs with respect to the Borrower, then without any notice to the Borrower or any other act by the Lender, the Commitment shall thereupon terminate and the Note (together with accrued interest thereon) shall become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower, and (iii) exercise any and all of its other rights under applicable law, hereunder and under any other documents at law, equity or otherwise.

# ARTICLE VIII

## MISCELLANEOUS

SECTION 8.01. <u>Notices</u>. All notices, requests and other communications to any party hereunder shall be in writing (including bank wire, telex, facsimile transmission or similar writing) and shall be given to such party at its address or telex number set forth on the signature pages hereof or such other address or telex number as such party may hereafter specify for the purpose by notice to the other party hereto. Each such notice, request or other communication shall be effective (i) if given by telex, when such telex is transmitted to the telex number specified in this Section and the appropriate answerback is received, (ii) if given by facsimile transmission, when transmitted to the proper address and confirmed by telephone, (iii) if given by certified or registered air mail, when received or 72 hours after such communication is deposited in the mails, whichever is earlier, or (iv) if given by any other means, when delivered at the address specified in this Section; <u>provided</u> that notices to the Lender under Article II shall not be effective until received.

SECTION 8.02. <u>No Waivers</u>. No failure or delay by the Lender in exercising any right, power or privilege under this Agreement or the Note shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided in this Agreement shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 8.03. <u>Expenses; Documentary Taxes</u>. The Borrower shall pay (i) all out-of-pocket expenses of the Lender, including fees and disbursements of counsel for the Lender, in connection with any waiver or consent of this Agreement and the Note and other Loan Documents, any amendment hereof or thereof, the administration hereof or thereof, or any Event of Default hereunder, and (ii) if an Event of Default occurs, all out-of-pocket expenses incurred by the Lender, including fees and disbursements of counsel, in connection with such Event of Default and collection and other enforcement, judicial or administrative proceedings resulting therefrom. The Borrower shall indemnify the Lender against any transfer taxes, documentary taxes, assessments or charges made by any governmental authority by reason of the execution, delivery and performance of this Agreement or the Note.

SECTION 8.04. <u>Amendments and Waivers</u>. Any provision of this Agreement or the Note may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the Borrower and the Lender.

SECTION 8.05. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns, except that the Borrower may not assign its rights hereunder or any interest herein without the prior written consent of the Lender. The Lender may assign to one or more Persons all or any part of, or may grant participation to one or more

Persons in or to all or any part of, the Loan, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant of such assignment or participation shall have the same rights and benefits hereunder and under the Note as it would have if it were the Lender hereunder including, without limitation, the right to receive payments under Section 2.08. The Lender may, in connection with any such assignment or participation or as may be required by law or any Governmental Authority or other regulatory body, disclose any public and non-public information relating to the Borrower furnished by or on behalf of the Borrower or any of its Affiliates to the Lender.

SECTION 8.06.  NEW YORK LAW. THIS AGREEMENT AND THE NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE INTERNAL LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS.

SECTION 8.07.  Counterparts.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

SECTION 8.08.  Severability.  Any provision of this Agreement or of the Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 8.09.  Headings Descriptive.  The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

SECTION 8.10.  CONSENT TO JURISDICTION; ARBITRATION; WAIVER OF JURY TRIAL; ETC.

(a)    BORROWER HEREBY (i) IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY NEW YORK STATE COURT IN THE COUNTY OF NEW YORK OR UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK ("FEDERAL COURT") IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS, (ii) WAIVES ANY OBJECTION OR DEFENSE BASED ON DOCTRINES OF VENUE OR FORUM NONCONVENIENCE OR SIMILAR RULES OR DOCTRINES, AND (iii) IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH AN ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR FEDERAL COURT.

(b)    BORROWER AND LENDER WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

(c)    THE BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY APPOINTS NATIONAL CORPORATE RESEARCH, LTD (THE "NEW YORK PROCESS AGENT") WITH AN OFFICE ON THE DATE HEREOF AT 225, WEST 34TH STREET, NEW YORK, NEW YORK 10122, AS ITS AGENT TO RECEIVE ON BEHALF OF THE BORROWER AND ITS PROPERTY SERVICE OF COPIES OF THE SUMMONS AND COMPLAINT AND ANY OTHER PROCESS WHICH MAY BE SERVED IN ANY SUCH ACTION OR PROCEEDING IN ANY SUCH NEW YORK STATE COURT OR FEDERAL COURT AND AGREES PROMPTLY TO APPOINT A SUCCESSOR NEW YORK PROCESS AGENT IN THE COUNTY OF NEW YORK, STATE OF NEW YORK WHICH SUCCESSOR PROCESS AGENT SHALL ACCEPT SUCH APPOINTMENT IN WRITING PRIOR TO THE TERMINATION FOR ANY REASON OF THE APPOINTMENT OF THE INITIAL NEW YORK PROCESS AGENT AND THAT SUCH PROCESS AGENTS WILL ACCEPT THE APPOINTMENT IN WRITING AND CONSENT TO THE TERMS HEREOF AND THE BORROWER WILL DELIVER EVIDENCE OF THE FOREGOING TO THE LENDER TOGETHER WITH THE NAME AND ADDRESS OF ANY SUCCESSOR PROCESS AGENT.  IN ANY SUCH ACTION OR PROCEEDING IN SUCH NEW YORK STATE COURT OR FEDERAL COURT, SUCH SERVICE MAY BE MADE ON THE BORROWER BY DELIVERING A COPY OF SUCH PROCESS TO THE BORROWER IN CARE OF THE APPROPRIATE PROCESS AGENT AT SUCH PROCESS AGENT'S ADDRESS (SUCH SERVICE TO BE EFFECTIVE UPON SUCH RECEIPT BY THE APPROPRIATE PROCESS AGENT).  THE BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY AUTHORIZES AND DIRECTS SUCH PROCESS AGENT TO ACCEPT SUCH SERVICE ON ITS BEHALF.  AS AN ALTERNATE METHOD OF SERVICE, THE BORROWER IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING IN SUCH NEW YORK STATE OR FEDERAL COURT BY MAILING OF COPIES OF SUCH PROCESS TO THE BORROWER, BY CERTIFIED OR REGISTERED AIR MAIL AT ITS ADDRESS REFEREED TO IN SECTION 8.01.  THE BORROWER AGREES THAT, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE LENDER TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE BORROWER IN ANY OTHER JURISDICTION.

(d)    THE LENDER MAY, IN ITS SOLE DISCRETION, AS AN ALTERNATIVE TO LITIGATION ELECT TO ARBITRATE ANY CLAIM OR DISPUTE ARISING OUT OF OR RELATING TO THIS CONTRACT OR THE VALIDITY THEREOF AGAINST THE BORROWER IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION BY A SOLE ARBITRATOR.  IN THE EVENT THAT THE LENDER ELECTS ARBITRATION, THE BORROWER HEREBY CONSENTS TO SUBMIT THE DISPUTE TO SUCH ARBITRATION.  THE BORROWER MAY NOT ELECT ARBITRATION WITHOUT THE CONSENT OF THE LENDER  AND IS BOUND BY THE LENDER'S ELECTION AS BETWEEN LITIGATION AND ARBITRATION. THE ARBITRATION SHALL BE GOVERNED BY THE FEDERAL ARBITRATION ACT, 9 U.S.C. SECTIONS 1-16, AND JUDGMENT UPON THE AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED BY ANY COURT HAVING JURISDICTION THEREOF AS LIMITED HEREIN.  THE PLACE OF ARBITRATION SHALL BE IN THE COUNTY OF NEW YORK, STATE OF NEW YORK.  THE ARBITRATOR IS EMPOWERED TO AWARD DAMAGES IN EXCESS OF COMPENSATORY DAMAGES.  THE BORROWER AGREES THAT, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, A FINAL AWARD IN ANY SUCH ARBITRATION SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE AWARD OR IN ANY OTHER MANNER PROVIDED BY LAW.

(e)    NOTHING IN THIS PROVISION SHALL BE DEEMED TO (i) LIMIT THE APPLICABILITY OF ANY OTHERWISE APPLICABLE STATUTES OF LIMITATION OR REPOSE AND ANY WAIVERS CONTAINED IN THIS PROVISION; OR (ii) LIMIT THE RIGHT OF THE LENDER HERETO (A) TO EXERCISE SELF HELP REMEDIES SUCH AS (BUT NOT LIMITED TO) SETOFF, OR (B) TO FORECLOSE AGAINST ANY REAL OR PERSONAL PROPERTY COLLATERAL, OR (C) TO OBTAIN FROM A COURT PROVISIONAL OR ANCILLARY REMEDIES SUCH AS (BUT NOT LIMITED TO) INJUNCTIVE RELIEF, WRIT OF POSSESSION OR THE APPOINTMENT OF A RECEIVER.  THE LENDER MAY EXERCISE SUCH SELF HELP RIGHTS, FORECLOSE UPON SUCH PROPERTY, OR OBTAIN SUCH PROVISIONAL OR ANCILLARY REMEDIES BEFORE, DURING OR AFTER THE PENDENCY OF ANY ARBITRATION PROCEEDING BROUGHT PURSUANT TO THIS INSTRUMENT, AGREEMENT OR DOCUMENT.  NEITHER THIS EXERCISE OF SELF HELP REMEDIES NOR THE INSTITUTION OR MAINTENANCE OF AN ACTION FOR FORECLOSURE OR PROVISIONAL OR ANCILLARY REMEDIES SHALL CONSTITUTE A WAIVER OF THE RIGHT OF ANY PARTY, INCLUDING THE CLAIMANT IN ANY SUCH ACTION, TO ARBITRATE THE MERITS OF THE CONTROVERSY OR CLAIM OCCASIONING RESORT TO SUCH REMEDIES.

(f)    IF BORROWER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY, ON THE GROUNDS OF SOVEREIGNTY OR OTHER SIMILAR GROUNDS, FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL

PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGEMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, BORROWER HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT, THE NOTE AND ALL OTHER LOAN DOCUMENTS.

SECTION 8.11. Judgment Currency. This is an international transaction in which the specification of Dollars and payment in New York, New York (the "Specified Location"), is of the essence. Unrestricted and transferable Dollars shall be the currency of account in the case of all payments pursuant to or arising hereunder, and all payments to be made by the Borrower to the Lender shall be made at the Specified Location to account #4068-7636 maintained at Citibank, 399 Park Avenue, New York, New York 10043. The payment obligations hereunder or under any other Loan Document shall not be discharged by an amount paid in another currency or in another place, whether pursuant to a judgement or otherwise, to the extent that the amount so paid in prompt conversion to Dollars and transfer to the Specified Location under normal banking procedures does not yield the amount of Dollars due hereunder. If, for the purposes of obtaining judgement in any court, it is necessary to convert the sum due hereunder in Dollars into another currency (the "Other Currency"), the rate of exchange used shall be that at which the Lender could, in accordance with normal banking procedures, purchase Dollars with the other currency on the Business Day preceding that on which final judgement is given. The obligation of Borrower in respect of any such sum due from it to Lender hereunder shall, notwithstanding any judgement in such other currency or any payment in such other currency, be discharged only to the extent that, on the Business Day immediately following the date on which Lender receives any sum in the other currency, Lender may, in accordance with normal banking procedures, purchase Dollars with the other currency. If the Dollars so purchased are less than the sum originally due to Lender in Dollars, Borrower agrees, as a separate obligation and notwithstanding any such judgement, to indemnify Lender against any such loss.

SECTION 8.12. Right of Set-off. Upon the occurrence and during the continuance of any Event of Default, the Lender may, and is hereby authorized to, at any time and from time to time, without notice to the Borrower (any such notice being expressly waived by the Borrower) and to the fullest extent permitted by law, set off and apply any indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all obligations of the Borrower now or hereafter existing under any Loan Document, irrespective of whether or not the Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured. The Lender agrees promptly to notify the Borrower after any such set-off and application made by the Lender, provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Lender under this Section 8.12 are in addition to the other rights and remedies (including, without limitation, other rights of set-off) which the Lender may have.

SECTION 8.13.  No Party Deemed Drafter.  The Borrower and the Lender agree that neither party hereto shall be deemed to be the drafter of this Agreement and the Borrower and the Lender further agree that in the event this Agreement is ever construed by a court of law, such court shall not construe this Agreement or any provision of this Agreement against any party hereto as the drafter of this Agreement.

SECTION 8.14.  Language Clause.  In the event that this Agreement is translated into any language other than English and there is a dispute between the English version and the other version of this Agreement, the English version will be controlling.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

Riječki list, d.o.o.
Rijeka, Croatia

By: _____
Name: Zdenko Mance
Title: Director

RIJEČKI LIST d.o.o.
Rijeka, Zvonimirova 20a

Address:
Zvonimirova 20a
51000 Rijeka
Croatia


MEDIA DEVELOPMENT
LOAN FUND

By: _____
Name: Harlan M. Mandel
Title: Deputy Managing Director

Address:
45 West 21st Street, 4th floor
New York, New York  10010

Verification: Mari A. Budeša
Telephone: (1 212) 807 1852
Telecopy: (1 212) 807 0540

## Schedule I

### Subsidiaries

- **Adamić, d.o.o. (100%)**
- **Karlovački list, d.o.o. (75%)**

## Schedule II

### Debt

**Presently NONE.**

The Borrower shall not create, incur or suffer to exist any Debt other than Debts specified in Section 6.02 hereof, without the prior written consent of the Lender.

## Schedule III

### Liens

**Presently NONE.**
The Borrower shall not create or suffer to exist any Lien other than Liens specified in
Section 6.01 hereof, without the prior written consent of the Lender.

## Schedule IV

### Investments

**Presently NONE.**

Only an investment for which the Borrower shall have obtained the written consent of MDLF shall be considered a Permitted Investment.

## Schedule V

## Guarantees

**Presently NONE.**

The Borrower shall not assume or indorse any Guaranty other than Guaranties specified in Section 6.06 hereof, without the prior written consent of the Lender.

## EXHIBIT A

This Exhibit A completes items of information in the Credit Agreement between Riječki list, d.o.o., Rijeka, Croatia, and Media Development Loan Fund (the "Credit Agreement") to which this Exhibit A is attached. Terms defined in the Credit Agreement are used herein with the same meanings.

Item 1.    Date of Credit Agreement (preamble):
**October 28, 1999**

Item 2.    Amount of Commitment (preamble and definition):
**EURO 970,000**

Item 3.    Use of Proceeds (preamble and Section 4.10):
**The proceeds of the Loan can be used by the Borrower only for the acquisition of shares of Novi List, d.d., Rijeka, Croatia ("Novi List") in accordance with the Memorandum of Understanding signed by both Parties and Novi List, dated October 28, 1999 (the "MoU"), attached hereto as Appendix 1. Specifically, the proceeds of the Loan can be used only for the following purposes:**
**(a) acquisition of treasury shares of Novi List;**
**(b) acquisition of shares of Novi List from the members of the Borrower;**
**(c) acquisition of shares of Novi List from other shareholders of Novi List pursuant to an open offer to purchase, including deposit preliminary thereto pursuant to Croatian Law on Take-Over of Joint Stock Companies; and**
**(d) following the determination of the total number and cost of the above specified shares, the remainder of the proceeds can be used for the acquisition of shares to be newly issued by Novi List; provided, however, that the number of shares so issued and acquired by Borrower may not cause the ownership interest of Media Development Equity Fund in Novi List to decline below 30% of its total shares.**
**The unused portion of the Loan proceeds (the "Returned Proceeds") shall be returned to the Lender immediately upon determination of the amounts required under purpose (d) above.**

Item 4. definition):    Location of local commercial bank for purposes of Business Day

**Rijeka, Croatia**

33

Item 5.  Default Rate (definition):
Ten (10) percent per year

Item 6.  Interest Rate (Section 2.03(a)):
Two (2) percent per year

Item 7.  Interest Payment Dates (Section 2.03(c)):
The interest shall be paid together with the principal in accordance
with the repayment schedule as specified in Item 13 hereof.

Item 8.  Financial Statements of the Borrower (definition):
Monthly, quarterly, semi-annual and annual financial reports, the
content of which shall be specified by the Director of Finance of
the Lender.

Item 9.  Loan Documents (definition and Section 3.01(b)(i)):
1) The Loan Agreement;
2) The Promissory Note;
3) Resolution of the Management Board of the Borrower,
certified by its Chairman, authorizing:
    (i) the borrowing hereunder and the transactions
    contemplated by this Agreement,
    (ii) the execution, delivery and performance by the
    Borrower of this Agreement and the Note and the execution
    and delivery of the other Loan Documents to be delivered
    by it in connection herewith and therewith;
4) A Certificate signed on behalf of the Borrower by Chairman of the
Management Board of the Founders, dated the closing date,
certifying:
    (i) verification of the authority of the person or persons
    signing the Loan Agreement, the Note, or any other Loan
    Document, together with a specimen signature of each
    person named herein, and
    (ii) the attached resolution of the Management Board
    approving the Loan Agreement and the transactions
    contemplated therein is true and complete and in full force and
    effect on the date hereof;
5) A Certificate by the Director of the Borrower certifying that copies
of Organizational Documents submitted to the Lender and dated
as of September 28, 1999, have not been changed or amended;
6) An evidence, in form and substance reasonably satisfactory to
MDLF and its counsel, of the registration with the National Bank
of Croatia, permitting the Borrower to make all payments

required by the terms of this Loan Agreement in United States Dollars; and

7) The Pledge of Shares Agreement by and between the Parties as set forth in Item 18 hereof and the MoU.

Item 10.      Maturity Date (definition):
June 30, 2007

Item 11.      Permitted Investments (definition):
Only an investment for which the Borrower shall obtain the written consent of MDLF shall be considered a Permitted Investment.

Item 12.      Account Instructions of Borrower (Section 2.01):
Account instructions shall be provided in the Notice of Borrowing.

Item 13.      Principal Payment Schedule (Section 2.02(a)):
The Borrower shall repay the principal amount of the Loan in six (6) installments according to the following schedule:

| | |
|---|---|
| June 30, 2002 | EURO   48,500 |
| June 30, 2003 | EURO 145,500 |
| June 30, 2004 | EURO 194,000 |
| June 30, 2005 | EURO 194,000 |
| June 30, 2006 | EURO 194,000 |
| June 30, 2007 | EURO 194,000 |

The schedule shall be revised should there be any Returned Proceeds, provided, however, that the grace period shall remain the same. Notwithstanding the grace period, the Returned Proceeds shall be immediately returned to the Lender as set forth in Item 3 hereof.

Item 14.      Minimum Prepayment Amount and Application of Prepayments (Section 2.04):
All prepayments shall be applied first to installment payments of principal on the Loan in the inverse order of maturity and then to interest accrued but unpaid to the date of such prepayment. The minimum prepayment amount shall equal 20% of the total value of the Loan.  Prepayments shall not include the Returned Proceeds.

Item 15.      Fees (Section 2.05):
Monitoring fee payable on January 15 for each calendar year during the Term of the Loan for as long as the Loan remains outstanding, in the amount to be determined based on the total amount of the Loan less the Returned Proceeds, according to the following schedule:

35

|  |  |
|---|---|
| up to EURO 45,000 | no fee |
| EURO 45,000-90,000 | higher of EURO 235 or 0.4% of the loan |
| EURO 90,000-230,000 | higher of EURO 375 or 0.35% of the loan |
| EURO 230,000-460,000 | higher of EURO 815 or 0.3% of the loan |
| EURO 460,000-930,000 | higher of EURO 1,400 or 0.25% of the loan |
| over EURO 930,000 | higher of EURO 2,300 or 0.2% of the loan. |

**Item 16.**   Commitment Termination Date (Section 2.07):
December 31, 1999

**Item 17.**   Organizational Documents (Section 3.01(b)(v)):
1) **Articles of Association;**
2) **By-Laws;**
3) **Extract from the Court Register of the Commercial Court of Rijeka;**

**Item 18.**   Additional Closing Conditions (Section 3.01(f)):
1) **The Agreements shall have been duly executed.**
2) **The Service Agreement between the Borrower and BankAustria for the establishment of the deposit required by the Croatian Law on Take-Over of Joint Stock Companies, shall have been duly executed.**
3) **The Borrower shall have executed and delivered to Lender an agreement with the Lender for the pledge of all shares in Novi List purchased by Borrower from its members, or contributed to Borrower by its members, as well as any shares in Novi List to be purchased by Borrower with the proceeds of the Loan, substantially in the form of Exhibit D.**

**Item 19.**   Additional Representations (Section 4.15):
**None**

**Item 20.**   Additional Affirmative Covenants (Section 5.11):
**None.**

**Item 21.**   Permitted Liens (Section 6.01(vii)):
**None, excluding Item 18(3), unless the prior written consent of the Lender has been obtained.**

**Item 22.**   Permitted Debt (Section 6.02(v)):
**None, unless the prior written consent of the Lender has been obtained.**

Item 23.     Additional Negative Covenants (Section 6.09):
             The Borrower shall not increase its basic capital without the prior
             written consent of the Lender.

Item 24.     Default Amount (definition and clause e of Section 7.01):
             Default Amount shall be EURO 97,000.

Item 25.     Additional Events of Default (Section 7.01(m)):
             1) Borrower's failure to execute or breach of the Pledge Agreement
                described in Item 18(3) hereof shall constitute an additional Event
                of Default.
             2) Termination of any of the Agreements for any reason other than
                its performance in full shall also constitute an Event of Default.
             3) Violation of any of the Agreements by any of the parties thereto
                shall constitute an Event of Default.
             4) Default by Borrower under the Foreign Exchange Loan Facility
                and Guarantee Agreement dated August 19, 1999, between the
                Borrower, Raiffeisenbank Austria d.d., Soros Economic
                Development Fund, Karlovački List d.o.o. and Adamić d.o.o. shall
                constitute an Event of Default hereunder.

Item 26.     Schedule of Loan Drawdowns (Section 2.01):
             The Loan shall be made in one drawing of EURO 970,000 to be
             credited to a special account.


MEDIA DEVELOPMENT                           RIJEČKI LIST, d.o.o
LOAN FUND, New York, NY, USA                Rijeka, Croatia

By: _____               By: _____
    Name: Harlan M. Mandel                       Name: Zdenko Mance
    Title: Deputy Managing Director               Title: Director


                                            ┌─────────────────────────┐
                                            │ RIJEČKI LIST d.o.o.      │
                                            │ Rijeka, Zvonimirova 20a  │
                                            └─────────────────────────┘


37

## EXHIBIT B

### PROMISSORY NOTE

**EURO 970,000.00**                                  **Dated:** _____, 1999
**New York**

For value received, the undersigned Riječki list, d.o.o., Zovnimirova 20a, Rijeka, Croatia, (the "Borrower"), promises to pay to the order of MEDIA DEVELOPMENT LOAN FUND (the "Lender") on the date or dates set forth in the Credit Agreement referred to below, the unpaid principal amount of the Loan made by the Lender to the Borrower pursuant to the Credit Agreement. The Borrower promises to pay interest on the unpaid principal amount of such Loan on the dates and at the rate or rates provided for in the Credit Agreement. All such payments of principal and interest shall be made in lawful money of the United States in Federal or other immediately available funds at: Citibank, 399 Park Avenue, New York, New York 10043, account # 4068-7636.

The Loan made by the Lender and all repayments of the principal thereof shall be recorded by the Lender and, prior to any transfer hereof, endorsed by the Lender on the schedule attached hereto, or on a continuation of such schedule attached to and made a part hereof; provided that any failure by the Lender to make any such recordation or endorsement shall not affect the obligations of the Borrower hereunder or under the Credit Agreement.

This note is the Note referred to in, and is entitled to the benefits of, the Credit Agreement, dated as of _____, 1999, between the Borrower and the Lender (as the same may be amended from time to time, the "Credit Agreement"), which among other things, provides for the acceleration of the maturity hereof upon the occurrence of certain events and for prepayments in certain circumstances, all upon certain terms and conditions specified therein. Notwithstanding any other provision of this Note, interest paid or becoming due hereunder shall in no event exceed the maximum rate permitted by applicable law. Terms defined in the Credit Agreement are used herein with the same meanings.

Except as otherwise set forth in the Credit Agreement, the Borrower hereby expressly waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note, and an action for amounts due hereunder shall immediately accrue.

38

This Note and interests herein may only be transferred to the extent and in the manner set forth in the Credit Agreement.

This Note shall be governed by, construed and enforced in accordance with, the internal laws of the State of New York applicable to contracts made and to be performed therein without consideration as to conflict of laws.

Riječki list, d.o.o.
Rijeka, Croatia


By: _____
   Name: Zdenko Mance
   Title: Director

## EXHIBIT C

### NOTICE OF BORROWING

Media Development Loan Fund
45 West 21st Street, 4th floor
New York, New York 10010

, 1999

Gentlemen:

      The undersigned Borrower refers to the Credit Agreement, dated as of
_____, 1999, between the Borrower and Media Development Loan Fund ("Credit
Agreement"; the terms defined therein being used herein as therein defined) and hereby
gives you notice pursuant to Section 2.01 of the Credit Agreement that the undersigned
hereby requests a Loan under the Credit Agreement, and in that connection sets forth
below the information relating to such Loan or drawing thereunder (the "Proposed Loan")
as required by Section 2.01 of the Credit Agreement.

    (i)    The Borrowing Date of the Proposed Loan is _____, 1999.

    (ii)    The aggregate amount of the Proposed Loan is _____ EURO.

    (iii)    The proceeds from such Proposed Loan are to be used as defined in
Item 3 of Exhibit A of the Credit Agreement.

    (iv)    The proceeds of the Loan should be made available to the
undersigned at

_____

_____

_____

      The undersigned hereby certifies that the following statement is true on the
date hereof, and will be true on the date of the proposed Loan:

    (A)    the representations and warranties contained in Article IV of the
Credit Agreement are correct on and as of the date of the proposed Loan, before

and after giving effect to the proposed Loan and to the application of the proceeds therefrom, as though made on and as of such date; and

(B)    no event has occurred and is continuing, or would result from such proposed Loan or from the application of the proceeds therefrom, that constitutes a Default or an Event of Default.

Very truly yours,

Riječki list, d.o.o.
Rijeka, Croatia

By:_____
Name: Zdenko Mance
Title: Director

41

## EXHIBIT D

## PLEDGE OF SHARES AGREEMENT

**MEDIA DEVELOPMENT LOAN FUND**, sa sjedištem u New Yorku, 45 West 21st Street, NY 10010, USA, zastupan po gosp. Mirku Franceschiju, odvjetniku (u daljnjem tekstu: "Vjerovnik")

i

**RIJEČKI LIST. d.o.o.**, sa sjedištem u Rijeci, Zvonimirova 20a, Rijeka, Hrvatska, zastupano po gosp. Zdenku Manceu, direktoru (u daljnjem tekstu: "Dužnik")

zaključili su dana _____ 1999. slijedeći

## SPORAZUM
## RADI OSIGURANJA NOVČANE TRAŽBINE
## ZASNIVANJEM ZALOŽNOG PRAVA

### Članak 1.

Vjerovnik i Dužnik suglasno utvrđuju da su dana _____ 1999. zaključili Ugovor o zajmu, kojim je Vjerovnik (zajmodavac) dao u zajam Dužniku (zajmoprimcu) iznos od 970.000,00 EURO (devet stotina sedamdeset tisuca), uz kamatnu stopu od 2% (dva) godišnje, te se Dužnik obvezao vratiti cjelokupni iznos zajma Vjerovniku najkasnije do 30. lipnja 2007. godine (dospijeće novčane tražbine).

Vjerovnik ima pravo otkazati Ugovor o zajmu u svim slučajevima grube povrede Ugovora u skladu s člankom VII Ugovora o zajmu, u kojem slučaju će novčana tražbina dospijeti u cijelosti danom dostave pismenog otkaza Ugovora o zajmu u skladu s člankom VII istog Ugovora.

### Članak 2.

Vjerovnik i Dužnik su suglasni da se radi osiguranja tražbine iz čl. 1. ovog Sporazuma, a u skladu s čl. 269. Ovršnog zakona, zasnuje založno pravo pljenidbenim popisom na svim dionicama Novog lista d.d. koje će Dužnik steći nakon zaključenja ovog Sporazuma.

Dužnik se, dalje, obvezuje upisati u knjigu dionica Novog lista d.d. kao imatelj dionica odmah po stjecanju istih. Sporazumne strane se obvezuju da će, nakon što se Dužnik upiše u knjigu dionica Novog lista d.d. kao imatelj dionica, potpisati Aneks ovom Sporazumu u kojemu će navesti ukupan broj i opis dionica koji je Dužnik stekao.

### Članak 3.

Sporazumne strane su suglasne da radi provedbe ovog Sporazuma javni bilježnik u njihovoj nazočnosti solemnizira ovaj Sporazum, te da provede pljenidbeni popis dionica iz članka 2. ovog Sporazuma odmah nakon što bude potpisan Aneks ovog Sporazuma. Sporazumne strane su suglasne da javni bilježnik objavi oglas u "Narodnim novinama" o provedbi osiguranja iz ovog Sporazuma.

### Članak 4.

Dužnik jamči da su dionice iz članka 2. ovog Sporazuma njegovo isključivo vlasništvo, te da nisu opterećene nikakvim teretima.

### Članak 5.

Vjerovnik obvezuje Dužnika da ishodi uknjižbu založnog prava na dionicama iz čl. 2. ovog Sporazuma u knjizi dionica Novog lista, d.d., te da Vjerovniku dostavi ovjeren prepis iz knjige dionica Novog lista, d.d., kojim se evidentira takva uknjižba.

### Članak 6.

Vjerovnik i Dužnik sporazumno utvrđuju da vrijednost založenih dionica iz st. 2. ovog Sporazuma koja će u ovršnom postupku biti osnova za utvrđivanje vrijednosti predmeta osiguranja radi njegovog unovčenja iznosi najmanje protuvrijednost 1.819.000 njemačkih maraka u kunama.

### Članak 7.

Ovaj potpisani Sporazum ima snagu ovršne isprave i Dužnik je suglasan da na temelju ovog Sporazuma Vjerovnik može neposredno tražiti i provesti prisilnu ovrhu na dionicama iz st. 2. radi naplate tražbine iz čl. 1. ovog Sporazuma po njenom dospijeću.

### Članak 8.

Dužnik snosi troškove javnobilježničkih pristojbi i nagrade, kao i sve ostale troškove vezane uz zasnivanje ovog založnog prava, uključujući i troškove oglasa u "Narodnim novinama".

## Članak 9.

Ovaj Ugovor stupa na snagu danom njegove solemnizacije kod javnog bilježnika suglasno čl. 269. st. 1. Ovršnog zakona.

## Članak 10.

Ovaj Sporazum zaključen je u 4 (četiri) istovjetna primjerka, od kojih 1 (jedan) primjerak za Vjerovnika, 1 (jedan) primjerak za Dužnika, 1 (jedan primjerak) za potrebe upisa založnog prava na dionicama u knjigu dionica i 1 (jedan) jedan primjerak za javnog bilježnika.

U Rijeci, dana _____ 1999.

Za MEDIA DEVELOPMENT LOAN FUND:

Za RIJEČKI LIST, d.o.o.:

_____
Mirko Franceschi
Po Punomoćju

_____
Zdenko Mance
Direktor

44

# Appendix 1

## MEMORANDUM OF UNDERSTANDING

Media Development Loan Fund ("MDLF"), Media Development Equity Fund, LLC ("Equity Fund"), Novi List d.d. ("Novi List") and Riječki list, d.o.o. ("Riječki list") (together, the "Parties") hereby agree as follows:

WHEREAS, Novi List is purchasing a new printing press and upgrading its printing facility;

WHEREAS, in order to consolidate the ownership of Novi List, the management of Novi List has established Riječki list to collect shares in Novi List;

WHEREAS, the members of Riječki list will transfer or have transferred all their shares of Novi List to Riječki list;

WHEREAS, Riječki list has purchased or will purchase the treasury shares held by Novi List;

WHEREAS, Riječki list intends to make an open offer to all other Novi List shareholders to purchase their shares in Novi List (the "Open Offer");

WHEREAS, in order to facilitate said consolidation of ownership, Riječki list wishes to borrow funds from MDLF for the purchase of Novi List shares;

WHEREAS, Equity Fund is fully owned and controlled by MDLF;

WHEREAS, in order to fund the upgrading of Novi List's printing facility and to further facilitate the consolidation of ownership in Novi List, Novi List wishes to issue new shares for purchase by Equity Fund, and possibly by Riječki list;

WHEREAS, MDLF wishes to provide Novi List the assistance described above in the form of two program related investments, one a loan to Riječki list from MDLF and the other an equity investment in Novi List by Equity Fund;

WHEREAS, to effectuate the two program related investments, the Parties intend to finalize a Credit Agreement between Riječki list and MDLF attached hereto as Exhibit 1 (the "Credit Agreement"), a Shareholders Agreement between Riječki list and Equity Fund attached hereto as Exhibit 2 (the "Shareholders Agreement"), a Share Subscription Agreement between Novi List and Equity Fund attached hereto as Exhibit 3 (the "Share Subscription Agreement"), and an Option Agreement (the "Option Agreement") between Novi List and Equity Fund attached hereto as Exhibit 4;

WHEREAS, to fund the purchase of the printing press, Novi List has entered into a Foreign Exchange Loan Facility and Guarantee Agreement dated August 19, 1999, with Raiffeisenbank Austria d.d, Soros Economic Development Fund ("SEDF"), Karlovački List d.o.o. and Adamić d.o.o. (the "RBA Agreement"); and

WHEREAS, for the benefit of Novi List, MDLF has guaranteed to SEDF that MDLF will reimburse to SEDF any funds it must pay pursuant to the guarantee provisions of the RBA Agreement;

THEREFORE,

A.   <u>Capital Increase</u>

1.  **Subscription of Shares:** Pursuant to a Share Subscription Agreement to be negotiated by Novi List and MDLF, Novi List will issue and Equity Fund will purchase 18,190 new shares (which will bring the total number of Novi List shares to 60,000). Equity Fund will pay 100 DEM per share, for a total of 1,819,000 DEM. The nominal value of the shares shall be 300 Croatian kunas.

2.  **Option to Repurchase Shares:** Equity Fund and Novi List will enter into an Option Agreement to be negotiated by the Parties, which will give Novi List an option to purchase up to 2/3 of the shares in Novi List to be purchased by Equity Fund under Section A.1 above. Novi List will not be able to exercise this option before the later of (a) one year after Riječki list completes repayment of its loan from MDLF (described below) or (b) Novi List satisfying all its obligations under the RBA Agreement. The option will expire on December 31, 2010. Equity Fund will not be permitted to sell this portion of the shares until expiration of the option, unless the Option Agreement has terminated earlier. The purchase price for those shares shall be determined by the Parties on the following basis:

    a.  Novi List and Equity Fund will agree on the market value of the shares at the time of Equity Fund's purchase and at the time Novi List exercises its option. The percentage change in market value over that period of time (the "Multiplier") will then be calculated.

    b.  The Multiplier then will be multiplied by the actual price paid by Equity Fund for the shares to arrive at the Calculated Option Share Value, which shall be the Exercise Price to be paid by Novi List for the shares, except that the Exercise Price shall in no case fall below a Minimum Option Share Value or above a Maximum Option Share Value.

    c.  To arrive at the Minimum Option Share Value, the actual price paid by Equity Fund per share shall be increased at a rate equal to LIBOR plus 2%, compounded annually over the period of Equity Fund's ownership. To arrive at the Maximum Option Share Value, the actual price paid by Equity Fund per share shall be increased at a rate equal to 10% compounded annually over that period.

3.  **Sale of Shares:** The Option Agreement shall provide that Equity Fund will be free to keep its ownership of the remaining 1/3 of its shares or to sell them as it sees fit. However, the Option Agreement will provide that Equity Fund may not sell before the earlier of (a) the date on which Novi List begins to exercise its option to purchase shares from Equity Fund or (b) June 30, 2009. Riječki list will have a right to approve the purchaser. Riječki list shall not unreasonably withhold such approval.

4.  **Access to Financial Records:** The Option Agreement shall provide that Equity Fund shall on demand be given reasonable access to Novi List's books and other financial records.

5.  **Approval of Equity Fund:** The Option Agreement shall provide that, until the earlier of (a) Equity Fund selling all its shares in Novi List or (b) two years after Novi List has fully exercised the option, but in any case no later than December 31, 2012, Novi List must obtain the written approval of Equity Fund and Riječki list in order to do any of the following:

    i) amend the Charter of Novi List;
    ii) reorganize Novi List;
    iii) liquidate Novi List;
    iv) increase Novi List's charter capital;
    v) issue additional voting shares in Novi List;
    vi) engage in transactions above 500,000 DEM which were not included into the Business Plan accepted by MDLF;

vii) enter into debts, liens, and other obligations above 500,000 DEM;

6.  **Termination of Option**:  The Option Agreement shall provide that, if Riječki list or Novi List breaches the Credit Agreement, Shareholders Agreement or Option Agreement, or defaults under the RBA Agreement, Novi List's option and all restrictions on Equity Fund's sale of its shares will immediately terminate, and Equity Fund will be free to sell 100% of its shares as it sees fit.

7.  **Improvements to Accounting System**:  The Option Agreement will require Novi List to change and improve its management accounting system to MDLF's satisfaction.

**B.**  **Loan to Riječki list**

1.  **Loan Amount; Loan Purpose**:  MDLF will loan up to EURO 970,000 to Riječki list (the "Loan") for the purchase of Novi List shares as follows:

    a.  Prior to the Open Offer, Riječki list shall be acquiring from its members their shares in Novi List (the "Member Shares"), as well as all the treasury shares currently held by Novi List (the "Treasury Shares").  Payment for those share acquisitions shall not be due until after completion of the Open Offer.

    b.  Riječki list initially shall use the entire Loan proceeds for part of the deposit for the Open Offer required under the Croatian Law on Takeover.  The Loan proceeds then shall be drawn down for the purchase of Novi List shares pursuant to the Open Offer.

    c.  Following conclusion of the Open Offer, Riječki list shall use any remaining Loan proceeds to pay for the Member Shares and the Treasury Shares.

    d.  After conclusion of all the above purchases, the remainder of the Loan proceeds shall be used for the purchase of additional shares to be newly issued by Novi List (the "Additional Shares").  The Additional Shares shall be priced at 100 kuna per share, and their total cost shall be equal to the remainder of the Loan proceeds.  To the extent the issuance of the Additional Shares would reduce Equity Fund's ownership in Novi List below 30%, the Additional Shares shall be divided among Riječki list and Equity Fund so as to maintain Equity Fund's 30% ownership interest.  In such case, Riječki list shall immediately repay to MDLF the portion of the Loan proceeds equal to the cost of the Additional Shares to be purchased by Equity Fund.

2.  **Interest Rate**:  The loan will bear interest at a rate of 2% per annum.

3.  **Repayment Schedule**:  Assuming the full EURO 970,000 is borrowed, the principal repayment schedule will be:

| | |
|---|---|
| June 30, 2002 | EURO   48,500 |
| June 30, 2003 | EURO 145,500 |
| June 30, 2004 | EURO 194,000 |
| June 30, 2005 | EURO 194,000 |
| June 30, 2006 | EURO 194,000 |
| June 30, 2007 | EURO 194,000 |

47

2.    Editorial Policy:  The Shareholders Agreement shall provide that Equity Fund will not interfere in the editorial policy of Novi List, but will support and vote for any editorial decisions of Riječki list.

3.    Voting: The Shareholders Agreement shall provide that Equity Fund and Riječki list shall consult on all other matters requiring the vote of Novi List's shareholders, shall only vote their shares by mutual agreement, and shall always vote in unison.  The Shareholders Agreement shall, however, provide a mechanism for avoiding deadlock.

4.    Purchase of Shares Coming to Market:  The Shareholders Agreement shall provide that, following completion of the Open Offer, when opportunities arise for purchasing additional shares from other shareholders, Riječki list and  Equity Fund shall each have the right to purchase 50% of the offered shares.   Equity Fund's right to participate in these purchases shall terminate when it has sold all its shares in Novi List.  Equity Fund's sale of these shares will be subject to the same restrictions as in Paragraph A.3 above.

5.    Sale of Shares by Riječki list:  The Shareholders Agreement shall provide that, until the earlier of (a)  Equity Fund selling all its shares in Novi List or (b) two years after Novi List has fully exercised the option, but in any case no later than December 31, 2012, Riječki list will be prohibited from selling, pledging or otherwise transferring or hypothecating any shares it holds or comes to hold in Novi List without written authorization from Equity Fund.

6.    Voting Rights in Novi List:  It is intended that  Equity Fund will have at least the same number of voting rights in Novi List as Riječki list.  However, depending on the number of Novi List shares that Riječki list is able to collect as Treasury Shares and from its shareholders, and purchase by means of the Open Offer, it is possible that Riječki list will hold more shares than Equity Fund.  The Shareholders Agreement shall provide that, in such a case, Riječki list will give Equity Fund a proxy to vote whatever number of Riječki list's shares in Novi List is required to achieve parity.

7.    Nomination of Supervisory Board:  The Shareholders Agreement shall provide that Riječki list and Equity Fund will use their votes as shareholders of Novi List to ensure that the Supervisory Board of Novi List shall have five members, that four members thereof, including the President, shall be nominated by Riječki list, and that one member thereof shall be nominated by Equity Fund.

E.    **General**

1.    Additional Terms:  The Parties agree that the purpose of this Memorandum of Understanding is to set forth their mutual understanding of the central elements of the matters addressed herein, and that the other details of these matters remain to be negotiated and finalized.  The Parties will enter into negotiations on the detailed terms of the Share Subscription, Option, Credit and Shareholders Agreements referenced herein. Unless and until the Parties negotiate and agree on all the terms of said Agreements and execute them, neither party is bound by this agreement to effectuate any of the matters addressed herein.

2.    Timing:  The Parties agree to use their best efforts to finalize the terms of the Subscription, Option, Credit and Shareholders Agreements referenced herein no later than October 10, 1999. All the attached agreements and any related documents shall be executed concurrently by Novi List, Riječki list, MDLF, and Equity Fund following any required approvals from the shareholders of Novi List and members of Riječki list.

MEDIA DEVELOPMENT LOAN FUND          NOVI LIST D.D.
MEDIA DEVELOPMENT EQUITY FUND        RIJEČKI LIST D.O.O.





March 25, 2002

Mr. Zdenko Mance
Director
Riječki list, d.o.o.
Zvonimirova 20a
51000 Rijeka, Croatia

**Re: Changes to the Credit Agreement dated as of October 28, 1999**

Dear Mr. Mance:

This letter acknowledges and confirms the agreement between Media Development Loan Fund and Riječki list, d.o.o., Zvonimirova 20a, Rijeka, Croatia to change the Credit Agreement dated as of October 28, 1999, as amended on January 25, 2000 (the "Agreement"), pursuant to Section 8.04 therein which provides that any provision of the Agreement may be amended if such amendment is in writing and signed by and between Media Development Loan Fund, New York, USA (the "Lender"), and Riječki list, d.o.o. (the "Borrower"). The terms defined in the Agreement are being used herein as therein defined.

*Whereas*, the Parties acknowledge technical difficulties with respect to Borrower's timely repayment;

*Now, therefore*, the Lender and the Borrower hereby agree to change the schedule of payments, both principal and interest thereon, under the Agreement as follows:

| date | principal (EUR) | interest (EUR) | total (EUR) |
|---|---|---|---|
| July 31, 2002 | 48,077.23 | 50,690.24 | 98,767.47 |
| July 31, 2003 | 150,000.00 | 17,156.70 | 167,156.70 |
| July 31, 2004 | 200,000.00 | 14,129.05 | 214,129.05 |
| July 31, 2005 | 200,000.00 | 10,092.18 | 210,092.18 |
| July 31, 2006 | 200,000.00 | 6,055.31 | 206,055.31 |
| July 31, 2007 | 100,000.00 | 2,018.44 | 102,018.44 |
| **grand total** | **898,077.23** | **100,141.92** | **998,219.15** |

**Media Development Loan Fund**
**USA** 45 West 21⁵ᵗ Street, New York, New York 10010   Phone: (212) 807 1304   Fax: (212) 807 0540
**Czech Republic** Na vinicnich horach 24, 160 00 Prague 6   Phone: (4202) 24 31 28 32   Fax: (4202) 24 31 54 19
e-mail: mdlf@mdlf.org   http://www.mdlf.org

Changes to the Credit Agreement dated as of October 28, 1998
March 25, 2002
page 2

The Agreement shall be honored and enforced only in its consolidated amended version.

If the foregoing accurately reflects our mutual understanding, please acknowledge your acceptance by signing below where indicated.  Please return the original signed contract to Elena Popovic at MDLF and retain a copy for your files.  We look forward to continuing cooperation with you.

Very truly yours,

MDLF

MEDIA DEVELOPMENT LOAN FUND
45 West 21st Street
4th Floor
New York, NY  10010, USA

By: _____

Harlan M. Mandel
Deputy Managing Director

Accepted and Agreed to
on this 28 day of March, 2002

_____

Zdenko Mancé
Director
Riječki list, d.o.o.

RIJEČKI LIST d.o.o.
Rijeka, Zvonimirova 20a

2